Van Duyne *v.* Vreeland.

---

JOHN H. VANDUYNE *vs.* JOHN H. VREELAND and others.

An uncle made an agreement with the father of an infant nephew, that he would take the infant, and would adopt him as his son, and that all his property should belong to the infant at the time of the decease of himself and wife. The child lived with the uncle under this arrangement over twenty-five years.

*Held,* that although the agreement was by parol, and was entered into more than thirty years ago, the rules of the court would not be relaxed, but strict proof of the agreement would be required.

That the uncle was not restrained, by the above agreement, from the use and

Van Duyne *v.* Vreeland.

disposal of his property during his lifetime, and that it was only upon the death of the uncle and his wife that the nephew could claim the property; but that the uncle could not make a disposition of the property inconsistent with the agreement.

If a defendant, in his answer, admits the parol agreement which is within the statute of frauds, but insists on the benefit of the statute, he is entitled to it notwithstanding such admission. But if he admits the agreement, without insisting on the statute, the court will decree a specific performance, on the ground that he has renounced the protection of the statute. Where the answer denies the parol agreement, the statute need not be set up as a bar.

In this case the uncle, when about sixty-five years old, having conveyed his farm, worth about $6000, to his wife's sister and her husband, who executed, as a consideration, a bond in the penalty of $6000, with condition to support and maintain obligee and his wife during their lives, &c., and it appearing that such grantee knew of the equities of the nephew—*held,* that such grantee would not be regarded as a *bona fide* purchaser, and that the conveyance being intended to defeat the agreement in favor of the nephew, the latter was entitled to relief.

The principles of equity will be applied to new cases as they are presented, and relief will not be withheld merely on the ground that no precedent can be found.

See, for this case on demurrer, 3 *Stockton* 370.

*Vanatta* and *Whelpley*, for complainant.

*Little* and *Whitehead*, for defendants.

THE CHANCELLOR. The foundation of this suit is a parol agreement, which is alleged to have been made by and between the defendant, John H. Vreeland, and Nicholas Vanduyne, since deceased, the father of the complainant. There was a general demurrer to the bill, which, after full argument, was overruled. The bill has been answered by all the defendants, and proofs have been taken, and the cause very ably and elaborately argued by counsel, on both sides, on its merits. I would refer to the opinion delivered in overruling the demurrer for a full statement of the complainant's case, and for the views of the court in relation to several interesting questions, which are necessarily involved in the decision of the cause. The same questions have been reargued on this second argument. After a re-examination, I see no

Van Duyne *v.* Vreeland.

reason for modifying or changing the views I have already expressed. Since the last argument, my attention has been called, by the complainant's counsel, to the case of *Hill* v. *Gomme*, 1 *Beavan* 541, which was not cited upon either argument. Every question which was raised on the argument of the demurrer was argued by the counsel in *Hill* v. *Gomme;* and I believe the opinion of this court upon those questions does not differ, in any respect, from that of *Lord Langdale*, master of the rolls, as reported in that case.

The case in *Beavan* was very like the present in all its important features. There was an agreement made between the father of the complainant and one Dean, of whose will the defendants were executors, by which the said Dean agreed, in consideration of £100 paid him by the father, to adopt the complainant, and bring him up as his son; and that Dean's heirs and executors should convey and assign the real and personal estate of which Dean should die seized and possessed, in such manner that the same should remain to the use of any widow of Dean for her life, and after her death to the use of the complainant absolutely, if Dean should have no child of his own; but if Dean should have any such child or children, then to the complainant and the child or children of Dean equally. Dean died without issue leaving a will, by which he disposed of his property without any regard to the agreement. The want of mutuality; that the complainant, not being a contracting party to the agreement, could not sue upon it; that this was a contract contrary to the policy of the law, for thereby a parent was contracting for the relinquishment of his child, the father thus depriving his son of that parental care which by the law of nature he was entitled to, and relieving himself from those moral duties and obligations which a parent owed to his child; and that the contract was vague, the circumstances doubtful, and the bargain most improvident and unreasonable, as depriving Dean of the possi-

bility of acquiring any future property over which he might exercise a free power of disposing, thus taking away every inducement to future exertion: all these questions were argued by counsel, and were resolved, by the court, in favor of the complainant. The final decision was against the complainant, but upon grounds entirely distinct from any of these questions. Those grounds were, that the consideration had never been paid, and there was no part performance; and that, from the facts of the case, it was to be presumed that the agreement was abandoned, by the original parties to it, before the complainant had himself acquired any rights under it. The master of the rolls said—"if Dean had, in pursuance of the deed, taken the boy home, and brought him up, there would have been a part performance, altering the condition in life of the boy; and in such circumstances, I incline to think that this court would not have permitted the father to take him back to his prejudice, and would have compelled a complete performance of the covenants in his favor; but this state of circumstances never arose—there was no appreciable part performance of those parts of the covenants which affected the boy: if taken from home at all, it was for a very short time, and no more altered his condition in life than merely sending him out as a nurse child would have done."

I will add nothing further upon these questions to what has already been said in the opinion to which reference has been made, and which was the foundation for the order overruling the demurrer, but will proceed to examine the case in the new aspect in which it is now presented by the additional pleadings and the proofs.

*First,* has the agreement been proved? *Second,* has the defendant, Vreeland, offered any satisfactory reason why he should not perform it? *Third,* is the complainant entitled *now* to any relief?

As it was very earnestly argued by counsel, that the agreement, as alleged in the bill, has not been proved (if

any agreement at all has been established), I will look at the agreement as it is stated, and its legal construction. I would premise, however, that the agreement was made upwards of thirty years ago; that it was a parol agreement, and no memorandum of any kind made of it. Precision of language in the proof of such an agreement is not to be expected. It is true that, for such considerations, the rules of the court should not be relaxed as to their requirements of proof of the agreement. The proof should be satisfactory. The court cannot from the proof of one part of the agreement, guess at another. Nothing must be left to mere conjecture.

The agreement stated in the bill, and the circumstances under which it was made, are as follows : that it was made about thirty-three years prior to the filing of the bill; that the complainant's mother was the sister of the former wife of the defendant, Vreeland; that the said Vreeland and his said wife had no children; that as soon as the complainant was born, Vreeland and his wife requested the complainant's father and mother to let them take the complainant, and permit them to adopt and keep him as their son ; and as an inducement for them to do so, they promised his parents to treat the complainant as their own son, and that all the property they had should be given to the complainant, so that it should belong to him at the death of Vreeland and his wife. It is said that the agreement, as stated, is indefinite and uncertain, and that, if proved in the very language it is stated, it would be difficult to put a construction upon it. I do not think so. The agreement was this—Vreeland and his wife were to adopt the boy. He was to be given up to them, and to be under their management and control, and when they died he was to have their property. It is true the agreement does not state whether the property should be secured to the complainant by deed, so that he might enjoy it when they died, or whether it should be left him by will. It was argued that it would make a very material

difference whether they were bound to secure to him, by deed, all the property they might acquire, or merely, by testamentary disposition, give him what they left at their death. It was thought by counsel, that in the former case it would restrict them from the use and disposal of their property during their lifetime. Now I do not think there is the least difficulty as to the legal construction to be put upon the agreement, as it is stated in the bill. The complainant, during the lifetime of Vreeland and his wife, or either of them, could not make any demand for any part of their property, or for the execution of any deed or writing to secure to him its enjoyment after their death. It was upon their death that he was entitled to the property, and it mattered not to him whether he derived it by deed or by devise. The agreement put no restraint whatever upon the parties to the free and unrestricted enjoyment of their property. They might give it away while they lived, but they could not make a disposition of it to take effect at their death. What property they left at their death, they had agreed that the complainant should have. *Johnson* v. *Hubbel*, 2 *Stock.* 335, and cases cited; *Gregor* v. *Kemp*, 3 *Swan.* 404. Is the agreement proved? It is insisted that the agreement is admitted by the answer, as well as fully established by the proof. The following is the admission of the answer: " This defendant further answering saith, that it is true that, soon after the birth of the complainant, this defendant and his said wife Rachael, having no children of their own, proposed to said Nicholas Van Duyne and his wife to adopt the complainant as their own child, and agreed, if permitted so to do, to attend to the bringing up of said complainant, and to treat him as a son as long as he treated and behaved to them as a dutiful child should do. And this defendant further saith, that it is also true that he not only promised to attend to the bringing up of said complainant, but the fact of his having no children at that time, and the probability that he never would have any,

was mentioned by him, at the same time to said Nicholas Van Duyne, as a reason why he should permit him to adopt said complainant as his own child ; and the defendant admits that he then assured said Nicholas, either in express terms, or in language which said Nicholas would probably so understand, that if he never had any children of his own, and said complainant continued to live with him, and demean himself as a dutiful, obedient, and affectionate child should do, he would not only treat him as a child during his life, but would, if he should survive the defendant, regard and treat him as his own son in the final disposition of his property; but this defendant did not promise or agree to give him all the property which he then owned, or which he might own at his death, or any particular or specific part thereof; and all that this defendant ever promised to do, or talked of doing for said complainant, was to be done only on condition, and with the express understanding, that said John remained with the defendant, and was and continued to be a dutiful and affectionate son to this defendant and his wife, especially in their old age; and this defendant has no doubt both Nicholas Van Duyne and his wife, the parents of said complainant, so understood this defendant."

It does appear to me that this is a substantial admission of the agreement, as it is alleged by the bill. Wherein does the defendant himself say it differs ? He says he did not promise or agree to give him all the property which he *then owned*, or which he might own at his death. The bill does not charge that he agreed to give the complainant all the property which he *then owned*, but " that all the property they had should be given to the complainant, so that it would belong to him when they died." The words " *they had*" are synonymous with the words " they might acquire." This, in fact, was nothing more than an agreement that the complainant should be his heir at law. He assured the father of the complainant, not only that he would treat him as a child during his life, but would,

Van Duyne *v.* Vreeland.

in the final disposition of his property, regard him as his own son. In connection with the admission, that he persuaded the father and mother of the child to let him adopt him, on the ground that he had no children, and that he did not expect to have any, the legal construction of the agreement, that he would treat him as his son in the final disposition of his property, is that he should take as his heir at law, and should have all that the law would give him in that capacity, which would be all his property.

But the answer further admits, that the complainant lived with him in the expectation of having his property, and that he told the complainant, at different times, that it was his intention to make the complainant his heir and to make a disposition of his property in the complainant's favor; and there are other admissions in the answer further corroborative of the agreement, as it is set out in the bill.

The proofs, in connection with the answer, establish the agreement as the complainant alleges it to have been. The complainant's mother proved it. The conduct of the complainant, for more than twenty years, was all in consonance with it. He made several wills, and by the disposition of his property recognised the agreement. He admitted it more than once to his neighbors; and he induced, by his repeated assurances, the complainant to act upon it, and to spend the best part of his life in the expectation of its faithful fulfilment. It is alleged that the agreement was made with Mrs. Vreeland as well as with her husband, and that she understood and carried it out just as the bill states it to have been. And the answer admits this. She always recognised the complainant as her son. She died after he arrived at the age of twenty-one years. She made a will leaving the complainant all her property, which, at her death, he took possession of with the defendant's consent, and has enjoyed it ever since. It is true the agreement was not legally binding

N*

upon her, and it does not appear that she had any legal right to dispose of her property by will; but she recognised and faithfully fulfilled the moral obligation resting upon her, and she did it with the consent of her husband. And I may add, while *she* lived, the defendant never repudiated his legal obligation. The agreement is admitted by the answer and it is established by the evidence.

But this is a parol agreement, and is within the provisions of the statute of frauds and perjuries. It is an agreement which is not to be performed within the space of one year after the making thereof. The defendant, in his answer, claims the benefit of the statute. It is now well settled, that if the defendant, by his answer, admits the parol agreement, and insists upon the benefit of the statute, he is fully entitled to it, notwithstanding such admission. But if he admits the parol agreement, without insisting on the statute, the court will decree a specific performance, upon the ground, that the defendant has thereby renounced the benefit of the statute. *Story's Eq. P.* § 763. If the defendant, by his answer, denies the parol agreement, he need not insist upon the statute as a bar. *The Ontario Bank* v. *Root,* 3 *Paige's R.* 478.

In this case, part performance is set up in avoidance of the statute. I think the answer admits, and the evidence shows a substantial performance of the agreement on the complainant's part, as well as such part performance on the part of the defendant himself as will take the case out of the operation of the statute. There has been such a performance on both sides as puts the complainant in a situation which is a fraud upon him, unless the agreement is fully performed.

In pursuance of the agreement, the defendant and his wife took the complainant, when but a few weeks old, and had him baptized, calling him by the defendant's own name, and standing for him; when he was a year old, they took him from the care and protection of his parents to their own home. They adopted him, and

brought him up in ignorance of his true parents. They claimed from him, and received the submission of a son. He never renounced his obligations to them as standing in the place of his parents. He resided under their roof until he was nearly twenty-one, obedient and exemplary in all respects. His own parents abandoned all control over him. His father, at his death, left a will, and relying upon the agreement that had been made with the defendant to provide for the complainant, he left all his property to his other children. It is perfectly manifest, from reading the defendant's answer, that he carefully sifted this complainant's whole life, his boyhood, his youth, and his manhood, in order that he might array against him all his delinquencies, as his own justification for refusing to fulfil this agreement. There are but few sons that could present a testimonial from a father's hand of filial obedience as creditable as this answer bears to that of the complainant. Taking his whole life, the defendant has been able to specify but two or three acts of disobedience, neither of which he has been able to prove, and all of which, as he shows in his answer, were trivial in the extreme. He says, when the complainant was only nineteen years old, without his consent, and against his express remonstrance, he married his present wife, to which alliance the defendant had special objection, and which he made known to the complainant. And yet he goes on, and admits that he received them immediately into his family, where they remained six months, and demeaned themselves with propriety; and that the complainant, then desiring to have a house of his own, the defendant purchased one for him. The defendant complains, that just after the complainant became of age, he caused himself to be elected constable, and that he then only worked for the defendant occasionally, and when he was particularly requested. There certainly is nothing in the agreement incompatible with the complainant's accepting such an office. But it turns out, by the evi-

dence, that he accepted the office with the full approbation of the defendant; that the defendant was his bondsman; that he went to a neighbor and procured him, after much solicitation, to join with him as security in the bond; and there is not a suggestion in the answer that the defendant ever made the slightest objection to the complainant's accepting the office. There are two other specific charges, but they are trivial in their character, and there is no proof of them. There are also general charges of neglect and want of energy and industry. The answer admits the fidelity of the complainant up to about the year 1850, and the defendant's assurances to him, up to that time, that he should have his property, and that he expressed to him his approbation of his conduct and his appreciation of his services. It alleges, that the complainant, after that period, grew negligent and inattentive, and that finally, in the spring of 1854, he sold his place, and moved from the neighborhood. These are the reasons, which the defendant alleges, why he considers himself released from all moral as well as legal obligations to fulfil the agreement. And yet the answer admits that no dispute or quarrel ever occurred between the complainant and defendant; that he never disobeyed him, except in the instances referred to; that he never refused to work for him whenever requested, and that the defendant always felt kindly disposed towards him. There is not really the slightest excuse for the defendant's refusing to fulfil the agreement. That the complainant did not pay him the proper attention after the year 1850; that he did not take charge of the defendant's affairs as formerly; and that he moved away and abandoned him, were consequences flowing from causes for which the complainant is not responsible. The change which had taken place in the defendant's household brought all these things about without imputing any fault to the complainant. The fact, that he left the neighborhood without the defendant's asking him why or where he was

going, and without any regrets expressed by the defendant, in connection with other facts stated in the answer and the evidence, show that it was not in the complainant's power to maintain between the defendant and himself the same relationship that had theretofore existed. I do not think that any one can read the proofs and pleadings in this cause without being perfectly satisfied that the complainant had fulfilled all the duties and obligations which rested upon him, so as to entitle him to the performance of this agreement on the part of the defendant, and that the defendant has given no satisfactory or reasonable excuse why he is morally or legally released from its obligations.

The remaining question is—is the complainant entitled *now* to any relief, and if he is, to what relief? This involves the question of the *bona fides* of the sale to Brickell, and whether Brickell is a *bona fide* purchaser without notice. The defendant, Vreeland, had a perfect right to dispose of the property as he pleased, provided he did not make a disposition of it to take effect after his death, which would have been a fraud in law, or constructive fraud upon the agreement, whether he intended it as a fraud or not, or a disposition of it, for the sole purpose of defrauding the complainant, and depriving him of the benefit of his agreement, which would have been an actual and positive fraud. *Fortescue* v. *Hannah,* 19 *Ves.* 66.

After a careful examination of this part of the case, the conviction is produced upon my mind that there was actual fraud in this transaction, and that it was resorted to by the parties for the purpose of defrauding the complainant, and of placing the property in such a position that he could derive no benefit from it after the death of Vreeland. The transaction, upon the face of it, is an extraordinary one, and is calculated to awaken the suspicion that the parties to it were actuated by motives other than are expressed upon the face of it. In 1849, the first wife of the

defendant died. In less than six months after, he mar-
ried his present wife. She was then about sixty years of
age. He owned this farm free of all encumbrances, and
worth at least $6000 as a cash price. It was well stocked,
and what other personal property the defendant had we
have no information by these proceedings. He was not
embarrassed or in want of any of the comforts of life. In
less than five years, he conveys his farm to his wife's
sister and her husband, and, as a consideration, this
sister and her husband executed to him a bond, in the
penal sum of $6000, with a condition that they, or either
of them, &c., should well and truly keep, board, maintain,
and provide for the said Vreeland and his wife, during the
term of each of their natural lives, all necessaries they
and each of them should stand in need of, so that they
and the survivor of them should have a good, decent, and
sufficient livelihood and support, suitable to their situa-
tion and condition, during the term of their natural lives,
and should also keep and maintain, in a suitable manner,
two colored servants of the said Vreeland during their
lives. To secure this bond, Vreeland took a mortgage on
the farm for $6000. This transaction enabled Brickell to
turn Vreeland and his wife from their home the next day,
and to support them wherever he pleased, so that it was
suitable to their situation and condition in life. It is true
Vreeland did not intend to give Brickell this power, for
in his answer, while accounting for this remarkable dis-
position of his property, he says he proposed to Brickell
that he would convey him the farm, upon condition *that
he would come and live with him,* and take care of him and
his wife as long as they lived. I do not believe that Vree-
land supposed he was executing papers which enabled his
grantee to turn him out of possession of his property.
Indeed he shows, by his answer, he was totally ignorant
of the business he was transacting, and acted but little
more than the part of an automaton. He says he does not
know why the wife of Brickell was one of the grantees,

Van Duyne *v.* Vreeland.

or why the consideration of $6000 was inserted in the deed. He had entirely forgotten the mortgage of $6000, which was the most important part to him of this whole matter, for he does not mention it in his answer. We can hardly conceive how a man, situated as Vreeland was, should have conveyed all his property to one who was of no kindred to him, and should have permitted a scrivener, a neighbor of his intended grantee, to draw all the papers, and should part with his property without understanding the character or legal effect of the papers he was executing. We cannot account for all this without supposing that there was something else operating upon his mind besides the desire of securing himself and his wife a livelihood for life. There was no necessity for such an arrangement. The consideration was an inadequate one. The complainant had left the neighborhood but a few months previous. He was irritated at this. He admits that, in consequence of this, he at once set himself to work to see what arrangement he should make with his property. He told Brickell that he had adopted the complainant, and of the supposed injuries and injustice he had received at the hands of the complainant.

Brickell is not a *bona fide* purchaser without notice. He does not stand in a position to claim the benefits of such a purchaser. He has not paid the purchase money. But there is proof enough to show he had notice of the complainant's rights. He admits Vreeland told him that he had adopted the complainant, and of the difficulties between them. He denies any knowledge of the agreement between the complainant's father and Vreeland, but he does not deny a knowledge of the facts from which some agreement might be inferred. His answer is contradicted. The old colored man and another witness told him of the complainant's claim. The terms upon which the complainant had been brought up were of public notoriety. He admits he had heard of some difficulty about the property before he commenced building, but says he

supposed it related to some other matter. He admits he may have said, when he heard that the complainant intended to claim said lands, that he felt safe under his deed, and yet he does not tell where he first heard of this claim or from whom. He conceals the fact of the mortgage of $6000, although this was very material, and his attention was called to it by the complainant's having stated, in his bill, that it was a lease. It appears, from the testimony of Mr. Vanatta, that the complainant had been misled as to the character of the writing which Vreeland had given the complainant, from some mistake of the clerk of the county in not giving it its proper place in the index of mortgages. He pretends, in his answer, he does not know why the sum of $6000 was inserted in the deed as the consideration. The production of the mortgage reveals that mystery, and explains why Brickell did not wish to know. He says he does not know why his wife's name was put in the deed, or at whose request. I do not think the answer and proofs can be read without carrying the conviction to an unbiased mind that this transaction never would have taken place between the parties, had it not have been for the relationship existing between the complainant and Vreeland, and the claim which the former had upon the property. The transaction was one best calculated to defeat the complainant's claim. Why was it adopted? It was a very unusual transaction, and yet the only reason given for it is, that Vreeland could not manage his farm, and wanted some one to take charge of it. The bargain is a most improvident one, and is not satisfactorily accounted for by such a suggestion. The conveyance would not be permitted to stand one moment if it was a *judgment* creditor of Vreeland who was applying for the aid of this court. It is as clearly fraudulent against the rights of the complainant.

Having reached the conclusion that the agreement has been proved; that by reason of its part performance it is not within the statute of frauds; that the defendant,

Van Duyne *v.* Vreeland.

Vreeland, has offered no satisfactory reason why it is not obligatory upon him to fulfil it; and that the conveyance to Brickell is a fraud upon the agreement, the most difficult question remains—to what relief, if any, is the complainant entitled?

The bill is not for specific performance. There can be no such thing as a specific performance in the case. The complainant is not *now* entitled to the enjoyment of the property, nor is it possible to ascertain to what part he will be entitled. He, by the agreement, is only entitled to such part of it as the defendant Vreeland may leave at his death. He may exhaust it all during his lifetime. But the complainant does not ask the court to give him the property. All he asks is that the court may protect him against the consequences of a fraud upon his rights, which will follow from the acts of the defendant, unless the court interferes for his protection. He alleges that he had an agreement with Vreeland respecting this property, and that Vreeland and Brickell have made a disposition of the property between them to defraud him of his rights under that agreement. He does not ask for any redress for that wrong, but that the court will protect him against future probable injury to his rights, which may justly be anticipated from the fraud the defendants have already committed. If Vreeland was dead, the complainant could now ask the court to declare the conveyance to Brickell a fraud, and to compel him to convey the property upon such terms as would be equitable. This, I think, properly comes under the denomination of bills *quia timet*. If this court does not interfere now for the protection of the complainant, and secure this property at the death of Vreeland, it may have passed into the hands of a *bona fide* purchaser, and the complainant then be remediless. A bill *quia timet* is to accomplish the ends of precautionary justice. The party seeks the aid of a court of equity *because he fears* some future probable injury to his rights or interests. They are applied to pre-

vent wrongs or anticipated mischiefs, and not merely to redress them when done. The relief granted must depend upon circumstances. 2 *Story's Eq. Jur.* § 826. "In regard to equitable property, the jurisdiction is equally applicable to cases where there is a present right of enjoyment and to ·cases where the right of enjoyment is future or contingent. The object of the bill, in all such cases, is to secure the preservation of the property to its appropriate uses and ends; and whenever there is danger of its being converted to other purposes, or diminished, or lost by gross negligence, the interference of a court of equity becomes indispensable." *Ib.* § 827.

Under articles executed on the marriage of Philip Cook, the plaintiff, in case she survived Philip Cook, claimed a contingent interest in two several sums of £100, each, the one in South Sea annuities, the other due by a promissory note of J. B., both which were specifically appointed for payment of the plaintiff in that event. The bill was upon the principle *quia timet;* for that, as the defendant had aliened, or threatened to alien those sums, there might be nothing to answer that interest, which might become beneficial to the plaintiff; and the defendant admitted he had sold out £100. The master of the rolls, in deciding the case, says—Here he has directly broke his covenant; and therefore it would be a rash action to trust to the event of things by the plaintiff's taking a chance when this £200 is gone; therefore, some way or other, the plaintiff is entitled to relief. *Flight* v. *Cook,* 2 *Ves. R.* 620, *case* 213.

I have thought much as to what particular relief can be given in this case. I have not been deterred from casting about to find some relief, from the fact that no precedent can be found as a guide for the particulars of the decree. We have principles, and we must apply them to the case as it is presented. A decree merely enjoining the defendant, Brickell, from aliening the land,

or merely declaring him a trustee holding the land subject to the agreement, would be an imperfect decree. The rights of all parties should be determined, and the terms of the trust specified. I have, after much reflection, determined to direct a decree to this effect—that the conveyance from Vreeland to Brickell be declared a fraud upon the agreement existing between the complainant and Vreeland; that Brickell be decreed to hold the land subject to that agreement, and upon the following terms: that at the death of Vreeland an account shall be taken, in which allowance shall be made to Brickell for the value of such permanent improvements as he may have put upon the lands, and for his costs, expenses, and trouble for the support of Vreeland and his wife and of the two colored servants up to the time of Vreeland's death, under the bond of the eighth of November, 1854; that Brickell shall then account for the rents and profits of the land; and that upon the payment, by the complainant to Brickell, of whatever may be found due the latter upon such accounts, Brickell shall convey the land to the complainant, which shall remain subject to the widow's dower, if Mrs. Vreeland should survive her husband.

It appears to me such a decree is equitable, and respects the rights of all parties. Vreeland cannot complain of it. The court does not interfere with his right to dispose of his property as he pleased, except so far as it is a fraud upon his agreement with the complainant. By his conveyance to Brickell, he has deprived himself of all control over the property, except so far as he has retained an interest in it to secure his agreement with Brickell. The decree will not interfere with the enjoyment of it, as far as he has secured it for himself. As far as Brickell is concerned, it is admitted, and there is no doubt of its sufficiency to remunerate him for any expenditures he may incur in the support of all the persons entitled to support up to the time of Vreeland's death. If

there is anything over after Vreeland's death, the complainant's claim to it is paramount to that of Brickell. Brickell can lose nothing, as the property is ample for his security. It is right that Mrs. Vreeland's dower in the property should be secured. Upon her marriage with Vreeland, she acquired an inchoate right of dower in the property, notwithstanding the agreement of which the complainant claims the benefit. The agreement with the complainant was subject to such a contingency. At Vreeland's death, the parties may make their settlement upon the terms of the decree. If they cannot, they have their redress in this court. The decree settles their rights.