Craighead v. Pike.

---

## FRANCES CRAIGHEAD

### v.

### ELLEN M. PIKE et al.

[Submitted April 12th, 1899.   Decided May 18th, 1899.   Filed September 26th, 1899.]

1. Marsh land was purchased by P. with partnership funds, and held in trust for the benefit of complainant's ancestor and two others, who were jointly interested with P. in an enterprise to reclaim and sell it. On the death of P. one of the *cestuis que trustent* filed a bill for the purpose of establishing the trust, and the court decreed that the lands were held in trust by P. for a copartnership composed of complainant's ancestor, P., and two others, which had been dissolved by the death of P., and that such survivors should have charge and control of the lands and title thereto for the purpose of disposing of them and dividing the proceeds among the partners. The enterprise for which the lands were purchased failed and was carried on at a loss. Over twenty years have elapsed since the decree authorizing the sale of the lands by the survivors. There were no partnership debts.—*Held,* that complainant was entitled to a partition setting off her share of the lands.

2. It is no defence to an application for partition of partnership lands that the lands which are held by the surviving partners are about to be utilized at a profit in a manner other than that contemplated by the partnership when formed.

3. In a bill for partition of lands belonging to a partnership, it appeared that tracts as large as it would be necessary to assign to complainant had been sold to individuals.—*Held,* that the setting off of complainant's share would not be so detrimental to defendants as to warrant a refusal of partition.

4. The court will refuse to order a sale of partnership lands and payment to complainant of her share of the proceeds of the sale of the property in an action for partition, when it appears that the land has been in the market for a long time, and could not be sold without great loss, but will set off to her her share *in specie.*

In partition. Heard on bill, answer and proofs.

(For previous proceedings in the cause, see *Craighead* v. *Pike, 38 Atl. Rep. 296.*)

*Mr. Charles L. Corbin,* for the complainant.

*Mr. James B. Vredenburgh,* for the defendants.

PITNEY, V. C.

The complainant has established her right in equity to a one sixty-fourth part of the lands and premises described in the bill, and to a one sixty-fourth part of the stock of an incorporated company called the Irondyke and Land Reclamation Company of New York, which is the owner of a tract of land adjoining that in which the complainant has established her direct equitable interest.

In round figures, the first main tract consists of about twenty-eight hundred acres, and that owned by the reclamation company about seven hundred acres.

These lands are what is known as salt marsh, and lie on the west side of the Hackensack river, bordering on that river for a distance of between three and four miles, commencing at the Newark plank road on the south, following the windings of the river to Saw Mill creek, thence westerly up the windings of that creek to high ground, and following the high ground southerly until it strikes Frank creek, and following Frank creek to the line of the Delaware, Lackawanna and Western and Pennsylvania railroads, and following the lines of those railroads easterly nearly a mile; then following the line of the Passaic river southerly to a point some distance south of the Newark plank road, and thence northerly to a point on the Newark plank road about half way between the Passaic and Hackensack rivers.

Most of these lands were purchased by Samuel N. Pike from Spencer B. Driggs in August, 1867. Pike purchased and held the title in trust for himself and three others, namely, Joseph Tilney, George W. Kidd and Samuel Craighead. Craighead's

interest was one-sixteenth only. The complainant claims through Samuel Craighead.

The only proof of any special contract between the four original tenants in common as to dealing with this property is found in a contract between Driggs, the original owner, and Pike, dated August 13th, 1867, which recites that Driggs is the inventor and patentee of an improved mode of reclaiming marsh and swamp lands, described in certain letters-patent, which Driggs had recently assigned to the Irondyke and Land Reclamation Company, and that Driggs was desirous of having said tracts of marsh land *reclaimed and made arable* by means and use of the said patent, and recites that Pike was desirous of acquiring the lands and of having the same reclaimed by the means and use of the said patent; *and Driggs agreed to thoroughly and completely drain and reclaim said land so as to make it arable, by the application of the patented apparatus.*

The means of reclamation were the building of an embankment around the whole tract where met by the tide, including the two creeks, to wit, Saw Mill creek and Frank creek, said embankment to be fortified by plates of iron extending through the center of it in such manner as to prevent its being undermined by muskrats and the like, and placing at proper points in the embankment sluices provided with automatic gates, which would permit the water to run out at low tide, and prevent it from coming back at high tide.

This work of diking and placing of gates was accomplished at great expense, and has been substantially maintained ever since, with the result that the meadows have been only partially dried; and such drying as has been accomplished has resulted in the shrinkage of the peaty matter on the surface, so that whereas before the so-called reclamation the surface of the ground was about level with high tide, now over the greater part of the territory the ground is from six inches to two feet lower than high tide, and but for the diking would be covered with water at high tide.

Within a year or two of the launching of the enterprise Pike

bought out Driggs' interest, and thereby Pike, Craighead, Tilney and Kidd became sole owners.

Pike, the original purchaser and holder of this title, died December 7th, 1872, and on the 24th of February, 1874, George W. Kidd, one of the original *cestuis que trustent*, filed his bill in this court setting up the trust, with the result that on the 15th of March, 1876, a decree was made in that cause by this court reciting the joint enterprise of Pike, Tilney, Craighead and Kidd, and the purchase of the marsh lands on the joint account of the four persons just named, and with an agreement to divide the profits and proceeds of the sales thereof under a partnership agreement by the terms whereof the business of the partnership was to be carried on in the name of Pike and the title to the lands held in his name, but the capital furnished in the proportions therein mentioned, and that the capital thus contributed should be invested in the purchase of marsh lands to be reclaimed and sold and converted into money, and the proceeds and profits, or losses, should be divided among the partners in proportion to their several interests, and distribution to be made as soon as the lands were reclaimed or on the dissolution of the partnership. It further recited the purchase of the lands and the amount of money invested and expended in draining, reclaiming, cultivating and otherwise improving the lands in the lifetime of Pike. The decree then proceeded to declare that the lands were held in trust for a partnership composed of the four persons mentioned; that the partnership was dissolved by the death of Pike, and that thereby the right and duty of maintaining the system of drainage and improvement, settling up the said partnership affairs, disposing of the partnership assets, converting the same into money, dividing the proceeds of said lands among the parties interested in the said partnership, according to their respective interests as aforesaid, devolved upon the surviving partners; and declared that the surviving partners were entitled to have the legal title vested in them, to enable them to settle up said partnership affairs, sell and convert the said lands into money, divide the proceeds among the parties interested in said partnership, according to their respective interests; decreed

a conveyance by the eldest son of Samuel N. Pike to the survivors; and then decreed that the surviving partners do and shall proceed, without unreasonable or unnecessary delay, to settle all the affairs of the said partnership by selling and converting into money the said lands so to be conveyed and collecting and disposing of the other assets.

The only agreement of partnership set out in the bill of 1874, and relied upon to establish it, was a short declaration of trust signed by Pike and annexed to one of the copies of the original agreement between him and Driggs, and that declaration of trust merely states the share which each of the parties had in the enterprise; so that the only place in which the objects of the enterprise are clearly set forth is in the agreement before mentioned between Driggs and Pike.

During the joint ownership considerable tracts of the land were sold off. One hundred and sixty acres just west of the Hackensack river and south of the old Newark turnpike, were sold to the Pennsylvania railroad. Other smaller tracts were sold to other persons; and strips were taken by the Paterson and Newark Railway Company, and by the New York and Greenwood Lake Railroad Company; so that the tract is already divided into several parcels. First is a large tract north of the New York and Greenwood Lake Railroad Company, between that and Saw Mill creek, which tract is again divided by the old Belleville turnpike. Then south of the New York and Greenwood Lake Railroad Company, between that and the Paterson and Newark railroad, is another tract which is bisected by the old Belleville turnpike, and by a branch railroad running from the old line of the New York and Greenwood Lake railroad to the Paterson and Newark railroad. Then there is a strip between the Paterson and Newark railroad and the old Newark turnpike, which is again bisected by the Belleville turnpike. Then there is a wedge-shaped piece between the Delaware, Lackawanna and Western railroad and the Newark and Paterson road. Then there is a piece between the Newark and Paterson road and the Delaware, Lackawanna and Western railroad, and between the latter railroad and the Pennsylvania railroad. Then there is a

Craighead *v.* Pike.

large tract between the Pennsylvania railroad and the Newark plank road. Then there is a tract south of the plank road which has never been reclaimed.

The income from the property is insufficient to maintain it. It costs about $2,000 a year to maintain the dikes and automatic gates, and the income from rents, &c., is barely enough to pay that expense. The taxes of late years, amounting to about $5,000 a year, have been paid by assessments on the owners. There are no assets except the land and the stock of the reclaiming company, and there are no debts.

All the interest of Kidd has passed to the Pike estate, and that is owned by quite a large number of individuals, descendants of the original Pike, and some of them are infants.

Tilney is dead, and his interest has descended to his children, some of whom are minors.

Several defences are set up. First, that by the original contract between the original owners the premises were excluded from the operation of the ordinary right of partition between tenants in common, and devoted to development in a particular manner and for a particular use, which required that they should be held and owned in a body. That by the decree of 1874 the enterprise was declared to be a partnership and the lands partnership property, which can only be dealt with as such and as a whole; and that the right of the complainant is not an equitable title in the land itself, but in the proceeds of the lands when they shall have been disposed of by the holders of the legal title for the benefit of the partnership.

I am unable to adopt either of these views. The decree does, indeed, use the word "partnership," but a careful reading of it and of the agreements upon which it is based, shows that the word "partnership" was not there used in its ordinary signification as describing a trading partnership, but rather a joint venture in which each person was interested in certain proportions, and the surviving partners were directed to proceed at once to close up the affairs and divide the proceeds.

Over twenty years have elapsed and little or none of the property has been sold, most of the parting of title being by

condemnation proceedings for railroad purposes. The parties to whom the court entrusted the duty of winding up the affair are all either dead or incapacitated by want of interest from proceeding further with that duty; the partnership, so called, was declared by the decree to be dissolved, and the survivors acted only under the right of survivorship under the direction of the court. The original trust was a personal one. The parties entered into the arrangement relying on the personal ability of each to assist in carrying it through.

The project as originally launched has proved to be a failure; the land has not been rendered arable or fit for cultivation. The failure is due to several causes. In the first place, the tract is so large that after a rain the water settles and moves to the point of debouche into the river quite slowly, and so rests upon the surface for a long time; and in the second place, the lowest level to which it can be drained by the contrivance in question is about two feet above low-water mark and only about three feet below high-water mark, which leaves the water-level too near the surface to admit of cultivation or drainage. This proximity of the water-level to the surface has been increased by the drying up and shrinkage of the peat surface and consequent reduction of its level.

But it is urged on the part of the defendants that a new scheme for utilizing these lands is about to be developed which will be successful. That scheme, in brief, is to make at least two settling points several feet below tide level and place therein steam pumps, which are to be propelled continuously, and thus the surface drained quickly and to a depth several feet below tide level.

This plan is undoubtedly feasible but is a decided departure from the original scheme and will involve a very large expenditure of money, and was never contemplated by the original tenants in common, and never had the approval of Mr. Samuel Craighead, a part of whose original interest is now held by the complainant.

Clearly, the complainant cannot, against her will, be compelled to submit to the expense of such an enterprise.

Craighead *v.* Pike.

I have said the plan is feasible, but whether the result will be profitable is, in my judgment, quite speculative and uncertain. The inclination of my mind is to the opinion that the better plan by which to improve these lands is to fill them up with refuse and coal debris, so as to render them fit for occupation and use for manufacturing purposes, and sell them out in parcels for that purpose, and this remark applies particularly to all that part that lies north of the Pennsylvania railroad. It is traversed in every direction by railroads and trolleys and macadamized turn-pikes, so that lots can be sold off with ready access to means of transportation.

Further, I fail to find anything in the original contract to show that it was the contemplation of the original parties to hold this property to be sold in a single body. They undoubtedly contemplated selling it out in parcels, and supposed that the drainage system to be established would be so far automatic and perpetually self-sustaining as to drain the land and allow it to be held by different individuals in severalty for farming and other purposes, upon some sort of arrangement by which each owner should contribute toward the support of the system. I find it quite impossible to believe that the holding of the premises until they could be sold in a body was in the contemplation of the original parties.

And, upon reflection, I am of the opinion that the situation is not changed if we consider the original joint enterprise as a partnership proper, and these lots as its assets to be disposed of as partnership assets. The rule in this country is well settled that lands held for partnership purposes will be considered as converted into personalty only to the extent necessary to pay the partnership debts. All lands remaining after that purpose is served are liable to be divided *in specie* by partition proceed-ings. So that the case, under the view most favorable to the defendants' contention, stands thus: The complainant is entitled to have the partnership enterprise wound up. Its assets in part consist of lands. There are no debts. Under those circum-stances I can see no reason why she should not have her share

Craighead v. Pike.

set off to her *in specie.* *Freem. Co-ten.* *(2d ed.)* §§ *118, 443; Shearer* v. *Shearer, 98 Mass. 111.*

Formerly, the same rule prevailed in England, but latterly the disposition of the English courts has been to hold that land held by partners for partnership purposes is converted absolutely into personalty and must be disposed of as such upon dissolution. Probably the secret of this tendency of decision is the disposition of the English courts to avoid the injustice of the English canon of descent of real estate to the eldest son.

The disposition of the law is against holding land to be perpetually free of the right of partition, and the courts have only held such freedom under peculiar circumstances and for limited periods.

The leading case in this country is *Coleman* v. *Coleman, 7 Harris* *(19 Pa. St.)* *100.* That was a suit for the partition of the famous Cornwall ore banks and mine hills in Lebanon county, Pennsylvania, which were held under a peculiar agreement sanctioned by a decree made in the last century, and the decision against partition was put on the intrinsic difficulty, if not impossibility, of making an actual partition, and on the feasibility of the property being held in a sort of severalty according to the special agreement mentioned.

Another case is one in England, of *Peck* v. *Cardwell,* decided by Lord Langdale in 1839, reported in *2 Beav. 137.* There land was bought by four persons and laid out into building lots under a special and particular scheme by which the lots were to be sold for the benefit of all parties, and there was a provision for buying out the share of any one of the parties who desired to withdraw from the enterprise. The agreement is not fully set forth, and the question apparently not much debated or fully considered, the attention of counsel and court being devoted to another question arising in the cause. Neither of these cases covers the present.

But, in the second place, the defendants allege, and offer proof tending to show, that these lands cannot be divided or even so small a share as one sixty-fourth set off without great prejudice to the remainder. The theory of the defence is that it will be unfair

to the great majority who desire to keep the whole premises in a body, to take away even so small a portion. I have carefully considered all the evidence on that topic, and I am unable to accede to that contention. It seems to me that there can be no injury to the body of the tract by setting off one sixty-fourth, which will amount to only between forty and fifty acres. Parcels larger and smaller than that were sold voluntarily by the original joint proprietors, and without any undertaking on the part of the grantees to contribute towards the expense of sustaining the dikes.

But it is further said that the value of the different portions varies so much that it will be impracticable to set off to the complainant her part so that it will be in value just equal to one sixty-fourth of the whole. Here, again, I am unable to adopt that view. As we have seen, the land is traversed in many directions by railroads, turnpikes and trolleys; and it seems to me that there will be no difficulty in picking out forty or fifty acres or a tract of such size as, in the judgment of three sensible and intelligent commissioners, will amount in value to one sixty-fourth of the whole; for it must be remembered that the commissioners are not confined to laying off a plot which shall be in acres one sixty-fourth of the whole and one sixty-fourth in value. They may vary the size of the lot to make it, in their judgment, equal in value to one sixty-fourth of the whole.

Again, I think it would be a great hardship upon the complainant to compel her to submit to a sale of the whole premises in one block and to take one sixty-fourth of the proceeds. The Pikes and Tilneys have been trying for years to make a sale of these premises in one block, and proceedings in this partition were delayed from time to time upon the statement of counsel that a sale was about to be completed, and yet it never has been completed; and if the premises were decreed to be sold, as at present advised, I would not advise a decree that they be sold in a body but in reasonable parcels, so that each person holding a small share would be able to protect himself.

Upon the whole case, I think it but just to the complainant,

and by no means unfair to the defendants, that she should have her one sixty-fourth part set off to her.

The defendants, desiring not to have a partition among themselves but to have the power to sell as they shall be advised, may have a decree to that effect, which may be enforced to suit their convenience.