MARY ELLEN MILLER, administratrix, &c.,

*v.*

GORDON D. MILLER et al.

[Decided February 16th, 1912.]

The widow of a deceased partner, who was left a small money legacy, refused to accept it, and on the will being declared invalid took out administration on the decedent's estate. The surviving partner, who was a brother of the deceased, had, during the two years after his death, carried on the business, which earned about one-third of its estimated valuation. As soon as the wife attempted to take out administration, the brother sold the entire partnership property for much less than its estimated valuation to a newly formed corporation, which was composed of himself and members of his family.—*Held*, that the surviving partner having made the sale and refused the wife access to the partnership books, claiming that her husband's share amounted to very little, a receiver should be appointed to preserve the property pending litigation.

On application for a receiver pending suit.

*Mr. Randolph Perkins,* for the complainant.

*Messrs. Roe & Runyon,* for Gordon D. Miller.

GARRISON, V. C.

This is a bill filed by the administratrix of Alexander Miller, deceased, against Gordon D. Miller and Alexander Miller & Brother, Incorporated, to procure an accounting of the partnership of Alexander Miller & Brother, of which Gordon D. Miller is the surviving partner and of which the complainant is the administratrix of the deceased partner. Incidentally, the bill asked for a receiver. The present application is for a receiver *pendente lite,* and was heard upon the bill of complaint and proofs on behalf of the complainant, and proofs on behalf of the defendant Gordon D. Miller.

Whether or not the situation is one which calls for the appointment of a receiver at this time depends upon the proper inferences to be drawn from the facts in proof before me.

Prior to September, 1902, Alexander Miller was engaged with one Brown, in the business of building and repairing ships, machinery and other like operations, under the firm name of Brown & Miller, carrying on their business at the foot of Morris street, Jersey City, New Jersey. That partnership was dissolved on or about the 12th of September, 1902, upon the following basis: The inventory showed that the gross value of the assets of the firm was about one hundred and fifty thousand dollars; and Alexander Miller, assuming that, as between the partners, its actual value was about one hundred and twenty thousand dollars, made a buy-or-sell proposition to Brown upon that basis, and Brown, electing to sell, was bought out by Miller, who thereupon became the owner of the entire business.

Alexander Miller then took his younger brother, Gordon D. Miller, one of the defendants, into partnership with him under the firm name of Alexander Miller & Brother. Alexander Miller was married in 1898 to the complainant, and died in the city of New York on the 6th of May, 1909. From the formation of the partnership of Alexander Miller & Brother in 1902 down to the time of Alexander Miller's death at the time above stated, the brothers, under the partnership name aforesaid, carried on the business at the old stand with great success. According to Gordon Miller, the original understanding was that the partners were to share equally in the assets and profits. He avers that it is untrue, as asserted by the complainant, that he did not bring any capital into the business, but that, on the contrary, he did bring some in; he does not, however, specify when or how much.

He further avers that subsequently it was agreed that his interest in the assets and profits was changed to fifty-five per cent. and the interest of Alexander in the same to forty-five per cent. He further avers that it was provided by the articles of copartnership (which, however, are not attached by him to his proofs) that once in each year, or oftener, the copartners should make an inventory and account of all profits and all losses, and of all payments, receipts and disbursements, and should thereupon

clear and adjust the same; and that the inventory and account immediately before the death of Alexander Miller, which account was as of the date of January 31st, 1909, disclosed the interests of the partners as follows:

| | |
|---|---|
| Alexander Miller | $70,660 58 |
| Gordon D. Miller | 84,876 75 |
| | $155,537 33 |

The interest of Alexander Miller was, he avers, however, subject to a personal charge against him for excess drawings over profits of $30,672.11, which he avers was included in the assets of the firm as a debt owing by Alexander Miller to the firm. He also avers that there was another deduction of $3,151 to be made from Alexander Miller's interest because of an individual note of $3,000 which had been made by Alexander Miller in his lifetime and discounted at a bank, with certain collateral belonging to the firm pledged therewith; and that he, as surviving partner, took up the said note at the expense just mentioned.

He avers that at the time aforesaid, January 31st, 1909, the account was stated and settled upon the following valuations in inventory:

| | |
|---|---|
| Tools and machinery | $46,420 83 |
| Merchandise on hand | 13,611 21 |
| Motor power equipment | 2,711 59 |
| Machinery (not in use) | 672 85 |
| Patterns | 7,894 46 |
| Total | $71,310 94 |

and, in respect thereto, in an account in the surrogate's court for New York county, rendered by him as executor of his brother's will, and sworn to on the 16th of March, 1911, he states that with respect to the tools, machinery and motor power equipment above referred to, if sold separate from the plant as a going concern, they might not bring more than fifty per cent. of the values as above fixed.

He also, in the same account, states that, in his view, the good will of the firm is of nominal value, and that the good will of this firm was largely dependent upon the personality of Alex-

ander Miller, and the acquaintances which the said Alexander Miller had gained during many years in the business.

At the death of Alexander Miller his will was probated. By it, he gave his wife $12,500, and all the residue was to go to Gordon D. Miller and the other brothers and sisters of Alexander.

Gordon Miller continued the operation of the firm under the firm name, under the following circumstances, as clearly appear from his own proofs: He conceived that the only obligation that was owed to the widow of his brother was the $12,500 willed her by her husband, and he upon many occasions, he states, endeavored to get her to accept this bequest. Other than this, he conceived that he and his brothers and sisters were the entire owners of everything that his brother had left, and he thereupon proceeded to run the business as the partners had theretofore done. Instead, however, of accepting the bequest, the widow (the complainant herein) instituted some proceeding in New York, the result of which was that, on the 31st of May, 1911, a judgment was entered in a court in New York, based upon a verdict of a jury previously rendered, declaring that the said alleged last will and testament of Alexander Miller, deceased, was not in truth and in fact such, and that the probate thereof was invalid, and the decree of probate was set aside and annulled, and subsequently, and on the 7th of June, 1911, the letters testamentary issued upon the said will to Gordon D. Miller as executor were revoked, and the probate of the will was, by the same order, vacated and annulled.

On the 26th of June, 1911, letters of administration were issued to the complainant by the surrogate's court of the county of New York, under which she took upon herself the burden of administering the said estate. On the 1st of December, 1911, letters of administration upon the estate of Alexander Miller, deceased, were granted to the complainant in Hudson county, New Jersey.

It appears from the proofs submitted by Gordon D. Miller that, operating the business as he did from the death of his brother on the 6th day of May, 1909, up to the middle of June, 1911, he made profits approximately if not exceeding $40,000.

He avers in his affidavits that he was shocked, surprised and stunned by the decision in New York that the will of his brother was invalid, and immediately upon being advised of the verdict of the jury to that effect, and before the actual judgment had been entered, it appears that he set about selling and disposing of all of the assets, except the accounts receivable, of the firm of Alexander Miller & Brother, which he had been operating up to that time. It is extremely significant that although the widow and Gordon Miller were in constant litigation and their attorneys were frequently meeting, no notice of any sort was ever conveyed to her or to any of her attorneys by Gordon Miller, or by anybody on his behalf, of his intention to sell and dispose of the assets of the firm of Alexander Miller & Brother; and there is not the slightest suggestion that he ever thought of disposing of the same in the manner in which he did until after the verdict of the jury had been rendered.

Almost immediately after being advised of the verdict of the jury aforesaid, Gordon Miller, without having given any notice, as I have just related, to the widow of the deceased partner, set about a sale of the property of the late partnership. He finally determined to sell the same in lots at public auction, and in bulk if a larger price could be obtained than by selling them in lots. He caused four or five days advertisement to be inserted in the newspapers, and held a sale, at which the property was struck off to a corporation called the Tidewater Shipbuilding Company. It appears that this company was formed some few days before the sale by the brothers of Gordon Miller, and, he states, by other persons, but he does not name them. He admits that he is now interested in the said company, but does not say when he so became, and contents himself with a denial that he was an incorporator or stockholder at the time of the above mentioned sale. The price paid by this company was $17,800 for practically everything that belonged to the firm of Alexander Miller & Brother, excepting its accounts receivable. A few days after this the above-named corporation changed its name to Alexander Miller & Brother, Incorporated, and continued in business at the old place with the old equipment, and with Gordon Miller associated with it as one having financial interest

therein, the amount of which interest, however, he does not disclose.

It will be perceived by the briefest scrutiny of the proofs that at this juncture the situation was as follows: A business which at the inception of the partnership was bought by Alexander Miller upon the basis of $120,000, and which, by the figures brought forward by Gordon D. Miller himself, was worth in its tangible assets in the January before Alexander Miller's death in 1909, something over $70,000, was sold by the surviving partner to his own brothers and himself (for the facts make it inescapable that he was either interested then or contemplated being interested) for $17,800. By his own statements, in March of 1911, the tangible property, not including good will, &c., should have brought at least fifty per cent. of its inventoried value, even if broken up and sold in lots away from the business. Furthermore; it will be observed that this long-established, highly successful business, which had just made $40,000 in a period of two years, brought net about $17,800, and now is owned by a corporation using the name of the old concern, and in which this surviving partner is an owner to an undisclosed amount.

One cannot escape the conviction that notice of what he was about to do was purposely withheld from the administratrix of his brother's estate—for such she was at the time of this sale. One cannot escape the conviction that this hurried sale, determined upon immediately upon being advised that he and his brothers and sisters were not the sole owners of the business (burdened only with the necessity of paying $12,500 to the widow), was not the proper conduct of a surviving partner having at heart the interests of the trust; but was the conduct of a man who was bitterly antagonistic to the representative of his deceased brother, and was not, therefore, in a frame of mind to do what an impartial and properly acting trustee should do. No serious attempt seems to have been made to ascertain what this business would bring if sold as a going concern at this long-established place—the only effort in this direction being a three-line advertisement offering for sale a machine shop as a going concern, without details or any method to attract attention or to suggest

the identity of the business in question. He himself discloses in his proofs that the name of Alexander Miller had been long and favorably known; that their business was mostly at a distance from the home plant, so that the use of the name would for a long time be presumably of great value; that the plant was well equipped to do its work; that when operated by him for the twenty months succeeding his brother's death he had made large profits, and yet, immediately upon the event of the verdict of the jury changing his mind with respect to the desirability of continuing the business, or of winding it up under the most advantageous circumstances, he disposes of the tangible property at an auction sale, and allows the name to be used by the purchaser, with the result that the purchaser (in which he is financially interested) now has the name, the business, the stand, the good will and everything which contributed to the success of the previously-existing business.

Alexander Miller & Brother, the corporation, either purchased the name and good will, and the facts concerning that have been suppressed by the surviving partner, or did not purchase them and is being permitted to use them and get full worth and value out of them without paying anything therefor.

Since all the records of the business are necessarily within his control, it follows that the complainant is handicapped in an endeavor to specifically point out details or to obtain the benefit of whatever she might learn if given access to the books; but surely enough has been pointed out to show that under these conditions the protection of the estate of Alexander Miller requires that some impartial person should now be appointed to take charge of the assets of this late partnership and pursue those who are using its name, its good will, and perhaps, bring suit to set aside the sale, if it be found that it was collusive and improper. It does not follow that this course should not be pursued merely because the proofs show that the individual pieces of iron and steel as sold brought about what such things usually bring at auction sales. As I view it, that is an almost immaterial factor; and the factors which must be considered are those to which I have briefly alluded above—the success of the business, its long continuance at this stand, the value of its name, the

worth of its good will, its earning capacity as shown right up to the time of the sale, and then the fact of the sale (of which no notice was given to the complainant, who was the widow of the deceased partner), hurried through after brief advertisement, and resulting in the transfer of the name, the good will, the stand and the property into a corporation formed by insiders and now participated in as an owner by the surviving partner himself, who refuses to disclose any of the facts concerning his connection therewith, either as to the time when it began or the amount or interest of his holdings therein.

I am confirmed in my conclusion that the facts of this case imperatively demand protection of the estate by the appointment of a receiver by other considerations to which I shall make only brief reference. It appears that there is some real estate held in the name of Gordon D. Miller, which is alleged to be partnership property, but for which he charges rent to the partnership; there is other real property in the name of Alexander Miller, which is alleged to be partnership property. It also appears that the complainant here has made a large claim against the partnership, which is bitterly contested by the surviving partner, who denies that she has any claim, and alleges fraud upon her part in the strongest terms; and the whole case is redolent of the bitterness existing between the complainant and the defendant Gordon D. Miller.

Under these circumstances, it seems to me that an inevitable wasting of the assets of this partnership will take place if litigation is indulged in either against the late firm, or by it, dictated by bitter, hostile feeling rather than by just and reasonable views concerning the necessity or propriety thereof. An impartial receiver will, I am sure, be able to save many thousands of dollars of actual expenditure, as well as much time, in the consideration of just such matters as I have pointed out (and there are many others that I have not alluded to) ; whereas, if a receiver is not appointed, and the parties are left as they are, the hostility existing on each side will result in prolonged, expensive, harassing and unnecessary litigation, wasteful in each instance to the estate, which otherwise will be saved.

A further circumstance of great significance is this: A public accountant, who was called in, they say, for fourteen years during the existence of this firm and its predecessor, to make up their annual or semi-annual statements, testifies that about the middle of March, 1909 (a very few months, it will be observed, before Alexander Miller's death), the said Alexander Miller figured that his then interest in the firm was $39,988.47, and inquired of this accountant whether that was not so, to which this account-ant replied that it was. Since that time it appears from the un-contested proofs that at least $40,000 profits have been made, and yet, in the account furnished by the defendant Gordon Miller and attached to one of his affidavits, the amount now due Alex-ander Miller's interest is stated to be $1,203.28. To determine whether or not this is so the books, of course, would have to be carefully examined, and many questions would have to be de-cided, and I shall not stop to go through the various proofs that have been proffered in this respect. But the disparity between the amount concededly due on account of Alexander Miller's estate at the time of his death and the present amount conceded to be due is so great, and the method by which the shrinkage is accounted for is so without impartial consideration, and is based so entirely upon deciding everything against the estate and in favor of Gordon Miller, that another cogent if not controlling reason for putting these assets, books and other things into the hands of an impartial receiver is manifest.

Under all the circumstances, and after carefully considering the proofs, I am convinced that the interests of those entitled to the estate of Alexander Miller require that a receiver should be appointed for the late partnership of Alexander Miller & Brother, so that action, if necessary, may be taken against those who are now in possession of the assets, name, good will and previous business of that firm, its collectible assets may be collected and conserved, and the innumerable questions which are present may receive impartial consideration, and fruitless and unnecessary litigation may be avoided.