51 N.J. Super. 482 (1958)
144 A.2d 207
ANTHONY FORTUGNO, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT,
v.
HUDSON MANURE COMPANY, ET AL., DEFENDANTS-RESPONDENTS AND CROSS-APPELLANTS, AND ARTHUR FORTUGNO, DEFENDANT-APPELLANT AND CROSS-RESPONDENT.
ARTHUR FORTUGNO, THIRD-PARTY PLAINTIFF-APPELLANT AND CROSS-RESPONDENT,
v.
HUDSON MANURE COMPANY, ET AL., THIRD-PARTY DEFENDANTS-RESPONDENTS AND CROSS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued June 9, 1958.
Decided July 23, 1958.
*487 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Roger H. McGlynn argued the cause for Arthur Fortugno, as defendant-appellant and cross-respondent, and as third-party plaintiff-appellant and cross-respondent (Messrs. McGlynn, Stein & McGlynn, attorneys; Mr. Edward R. McGlynn, of counsel).
Mr. Adrian M. Unger argued the cause for all defendants-respondents and cross-appellants and all third-party defendants-respondents and cross-appellants, except Anthony Fortugno (Messrs. Milton M. and Adrian M. Unger, attorneys).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
This proceeding began as an action for the dissolution of a family partnership when Anthony Fortugno, one of the partners, filed his complaint and order to show cause on January 4, 1956 against the partnership and his co-partners. By the time of trial the pleadings, motions, exceptions and other papers numbered almost 200 pages. The trial itself lasted ten days and developed a record of over 1,400 pages, together with numerous and voluminous exhibits.
Defendants are the partnership, Hudson Manure Company, and Anthony's seven co-partners: Sylvia Fortugno (mother of the seven other partners), Daniel, Arthur, Alfred and Adeline Fortugno, Connie (Fortugno) Ruble, and Ann (Fortugno) Campanella. After defendants had filed their answer and a counterclaim alleging unlawful diversion of partnership funds, and plaintiff his reply, the Chancery Division *488 entered judgment on February 17, 1956 declaring the partnership dissolved and appointing Anthony's attorney, James A. McTague, Esquire, and defendant Daniel Fortugno, who was an attorney-at-law, as trustees "to handle the liquidation and distribution of the assets after collection and disposition of all claims and the payment of all debts * * *."
Subsequent to the entry of that judgment defendant Arthur Fortugno changed his position from that of the other defendants and filed a separate answer and counterclaim. He later filed an amended answer, counterclaim and cross-claim, and a third-party complaint in which he named all the partners, as well as Clinton Ruble, Ann's husband, third-party defendants. The trustees filed an inventory and accounting through August 31, 1956, to which Arthur took numerous exceptions  he also sought, unsuccessfully, to have the trustees removed  and a supplemental report for the period September 1, 1956 to March 20, 1957, to which Arthur took no exceptions.
By the time of the trial on April 29, 1957 Anthony had reached an accord with all the defendants except Arthur. The action thus became a contest between Arthur on one side and Anthony and the remaining partners on the other. The basic dispute concerned the distribution of partnership assets. The question was whether certain corporations, five in number, were assets of the partnership or owned by the individual partners. If they were assets of the partnership, were they to be distributed equally among the partners by means of shares of capital stock, or were the assets of each corporation to be treated as partnership property and (a) liquidated and the proceeds distributed, or (b) divided in their then form and distributed equally? Arthur claimed the corporations were assets of the partnership and that he was entitled upon dissolution of the partnership to his proportionate share in cash, rather than to be forced to exchange his position as an equal partner for that of a minority shareholder in the family-controlled corporations whose shares would have no value on an open market. The other partners contended that distribution should be of the shares of stock, *489 relying on a partnership agreement executed in 1940, discussed below. The corporations involved are: Fortugno Realty Company, C. & C. Trucking, Inc., Lescarboura Mushroom Company, Oxford Royal Mushroom Products, Inc., and Hudson Farms, Inc.
The trial court, by its interlocutory order of July 18, 1957, in addition to disposing of other claims to be discussed hereinafter, held that the first four of the above-named corporations were not assets of the partnership, and ordered the equal distribution of their stock to the partners. The fifth corporation, Hudson Farms, Inc., was held to have been fraudulently formed with partnership funds; it belonged to the partnership, and was ordered sold. Arthur appeals this order (as well as all other interlocutory orders), particularly with respect to the finding that the first four corporations were not assets of the partnership. Defendants Sylvia, Daniel, Alfred, Connie, Adeline and Ann cross-appeal from the order with regard to the sale of Hudson Farms, Inc. Anthony filed a notice of cross-appeal from the order for the sale of Hudson Farms as well as from a determination that he had diverted $65,000 from the partnership which he had to repay. We dismissed his appeal on March 20, 1958, so that it requires no further consideration.
Arthur's present position, essentially, is that he is entitled to have the partnership pay him for his one-eighth interest. He does not necessarily demand that the various businesses be liquidated, recognizing the possible disastrous effects that such an order would have on the family. He does ask for a complete accounting of all the Fortugno enterprises for the purpose of determining the dollar value of his partnership interest and receiving cash payment therefor  this as an alternative to complete liquidation. He also challenges the court's finding that Anthony diverted only $65,000 from the partnership, claiming the amount to be $93,891.79; seeks to reverse the court's denial of certain salary and automobile claims; and wants new trustees, having no interest in the litigation, appointed.

*490 I.
Hudson Manure Company was founded about 1896 by Paul Fortugno, husband of Sylvia and father of the other parties. The business prospered, but in 1929 or 1930 he became less active due to poor health. The slack was taken up by the eldest son, Anthony, who at that time was the only child active in the management of the business. Anthony expanded the operation of the company, which theretofore had been limited to the collection of manure in Jersey City for sale to mushroom growers, to include collection from various areas in and about New York City. The father died March 5, 1934. By his will he gave his estate to his widow and seven children, share and share alike, and recited his desire that Anthony support the family in the manner to which they had become accustomed, from the income of Hudson Manure Company. The will stated, and Anthony so testified, that the testator had given the business to him in 1930 subject to support of the family, in consideration of the work he had performed for the company without consideration.
Whether Paul Fortugno had actually given Hudson Manure to Anthony in 1930 or had effected that result by will is of no moment. Shortly after the father's death, the widow and children orally agreed to form a partnership, with each owning a one-eighth interest in the business and property left by him. No consideration passed to Anthony, nor did he ask for any. This oral agreement controlled until January 2, 1940, when it was reduced to writing. In addition to providing that each partner would share equally in profits and losses, that each would enter on the partnership books a full and accurate account of all his transactions on behalf of the family enterprise, and that the partnership should last indefinitely, the agreement stated in paragraph IX:
"That at the termination of this partnership, by reason of any cause, a full and accurate inventory shall be prepared, and the assets, liabilities and income, both gross and net shall be ascertained; that the debts of the partnership shall be discharged: and all the moneys *491 and other assets of the partnership, then remaining, shall be divided in specie, between the parties, share and share alike." (Italics ours)
The partners who oppose Arthur rely upon the italicized portion of the paragraph in their claim that distribution should be of the corporate shares.
Following the written agreement the partnership affairs were carried on much as before. Anthony unquestionably was the mainstay and directing force of the family enterprise. He, in effect, did what he considered was in the best interests of the business; his was the final word in all decisions. His operations were obviously successful. While he managed the partnership its income provided ample support for the entire family, as well as a college education for the three younger brothers and at least two of the sisters. All of the children had, as youngsters, worked in the business, helping out when any of the regular employees failed to report for work. In 1937 Daniel, already admitted to the Bar of this State, began to work full-time for the partnership; and in 1949 Alfred, the youngest brother, started working full-time, interrupted only while he was in the armed services from August 1954 to May 1956. Adeline worked full-time in the office, and Connie also helped out  though apparently not as much as Adeline.
Brief reference to Arthur's activities appears appropriate. Except for the mother and sister Ann, who did no work for the business, Arthur contributed the least to the partnership. This was due partly to his contracting tuberculosis and partly to his attitude of "passive resistance," apparently adopted because of his inability to get along with his brothers. Although Anthony was the prime target of his antipathy, Arthur at various times did not speak to the others. He finished college in 1939, and was sick from 1940 to the middle of 1945. He then began working for the partnership in Pennsylvania and stayed on until January 1946, when he contracted pneumonia for six weeks. From June 1946 to October 1948 he again worked in Pennsylvania; because of a series of arguments with Anthony he became ill and went away until 1950. There followed the period of *492 "passive resistance," from 1950 to 1954, when he would go to the Jersey City office daily but do no work. In August 1954 he took Alfred's place in Pennsylvania and stayed until May 1956. During all his periods of inactivity Arthur continued to receive wages from the partnership. Although he claims the source of this money was his mother and Adeline, it seems quite clear that he was paid by the partnership, the money being deposited regularly in his checking account. As the trial court found, he fairly well knew the various activities of the partnership. Arthur asserts that he has wanted to get out of the partnership since 1948. He delayed in 1948 because of his illness, and in 1950 he did not want to start dissolution proceedings because of family tax difficulties about to be mentioned.
The partnership's original business was, as noted, the collection and sale of manure. Headquarters were in Jersey City, New Jersey. The partnership sold the manure to mushroom growers in southeastern Pennsylvania; it also derived an income from race tracks and other sources of supply for removing the manure. In the course of its operations the partnership found it convenient to put certain of its activities in corporate form. The first such corporation, Fortugno Realty Company, was established in 1935, about a year after the oral partnership agreement among the members of the family, to hold the real estate formerly owned by the father. The primary reason however  prompted by several accidents on the properties  was to limit the liability of the individual partners.
Anthony had in 1936 purchased an interest in the Lescarboura Spawn Company, a Delaware corporation, and turned it over to the partnership in 1943. That company operated in Pennsylvania; it was engaged in the business of growing and selling mushroom spawn and mushrooms, canning mushrooms and marketing the canned product. In 1946 the partnership increased its interest in the company to 50%, and the corporate name was changed to Lescarboura Mushroom Company. Lescarboura not only served the purpose of being a user of part of the manure collected by Hudson *493 Manure Company, but also acted as selling agent for the manure to other mushroom growers.
After World War II Hudson Manure further expanded its operations. In 1945-46 a new partnership headquarters building was erected at 311 Washington Street, Jersey City, on land bought for that specific purpose. Both the land and the building were and remain in the name of Fortugno Realty Company. All the family enterprises use the facilities of the building. In 1950 Clinton Ruble, who had married Connie Fortugno, began hauling manure for Hudson Manure on a contract basis, using his own trucks and equipment under the name C. & C. Trucking Company. The partnership purchased all the assets of Ruble's trucking outfit in 1954 and transferred them to a newly formed trucking corporation, C.C. & M., Inc. (almost immediately after changed to C. & C. Trucking, Inc.)
In 1953 the partnership acquired complete ownership of Lescarboura Mushroom Company. It had by then poured a total of $332,500 into this operation, and held notes for that amount issued by the corporation. Because of difficulties experienced with the name Lescarboura, a new Pennsylvania company, Oxford Royal Mushroom Products, Inc., was formed in 1954 and its capital stock issued to Lescarboura in return for the latter's assets and liabilities. Lescarboura thus became merely a holding company.
Although the partnership and the various corporations connected with it were prospering, not everything was smooth sailing. In 1950 the Internal Revenue Bureau began to investigate the affairs of Anthony and the other Fortugnos, both on a civil and criminal basis. The result was that Anthony was convicted in 1954 for income tax evasion and a $40,000 fine imposed. The partnership paid the fine and all trial expenses, each partner being willing to share the burden equally. In addition to the criminal proceedings the government placed a civil claim against the eight partners totalling $2,000,000, including penalties and interest. Rather than have the government make jeopardy assessments, followed by the filing of liens which would result in the seizure *494 and sale of the partnership properties and business, the Fortugnos agreed to and did deposit a total of $1,000,000 in cash with the government  $125,000 each  to be applied against whatever settlement figure might be agreed upon. The partners pledged themselves not to do anything that would dissipate the assets of the business, lest the government step in and disrupt their operations.
It should be mentioned at this point that Anthony carried on certain activities of the partnership on a cash basis. There was a walk-in vault at the Jersey City headquarters to which all the partners had access. However, Anthony and Adeline were the only ones to handle the cash. The procedure was to draw checks to the several partners, have them endorse and cash them, and then place the cash in the vault. Tens of thousands of dollars were kept in the vault at various times. According to the testimony of the other partners, it was not unusual for Anthony to withdraw large amounts of cash. The only record he kept of such withdrawals was contained in a little black book. Adeline made copies of these entries without Anthony's knowledge.
Added to the partnership's tax difficulties was the fact that by 1952 the younger brothers, particularly Daniel and Alfred, had begun to assume some control in the partnership operation. Anthony's decisions no longer went unquestioned. There were disputes and conflicts. Anthony was unhappy; he apparently had had his own way so long that he found it difficult to accept any other view. He wanted to get out of the partnership. By 1954 he had formulated a plan for dividing up all the partnership assets by distributing the shares of the various corporations as well as the obligations owed the partnership pro rata among the several members.
Arthur, too, wanted to get out of the partnership, but not in the manner Anthony proposed. He was suspicious of Anthony's activities with regard to obligations owed the partnership. On March 28, 1955 he wrote to the partnership accountant informing him that any changes already made, or contemplated, were without his approval. On April 19, 1955 his attorneys wrote Anthony, copies to all *495 the others except Alfred (then in the service), informing him that Arthur wanted to be bought out but would not press the matter at that time because of the pending tax case. The letter demanded that "no change or alteration be made in either the partnership structure or the corporate make-up of the corporations" until the tax matter was disposed of, and that Arthur would then want to meet with the other partners to discuss the disposal of his interest.
Just six days after this letter was written, Anthony caused Hudson Farms, Inc. to be incorporated in Pennsylvania, using dummy incorporators. He later had the stock issued to himself and his nominees. With money withdrawn from the partnership Anthony then purchased, in the corporation's name, land which the partnership had intended to buy for a composting operation in connection with its business. It was these actions, chiefly, that brought on the split between him and the other partners. There was also the matter of the race track manure contracts which Anthony controlled: he took them from the partnership, Hudson Manure Company, and put them in the name of either Hudson Farms, Inc., or C. & C. Trucking, Inc. By the end of 1955 Hudson Manure had ceased to operate and was in effect an empty shell, except for a few accounts receivable and a supply of manure. In August and November 1955 Anthony wrote the other partners seeking dissolution of the partnership. He received no reply. On January 4, 1956 he instituted the present action.
As already mentioned, between the time he formed Hudson Farms and the trial date Anthony reached an accord with all the partners except Arthur. On February 2, 1957 all the Fortugnos but Arthur signed an agreement whereby (among other things) Anthony was employed as general manager in charge of all manure operations at the stipulated salary of $25,000 a year plus an expense account, the salary to be paid by the several corporations in such amounts as they deemed advantageous. The agreement also governed the relations of the parties in case of disputes. If any party desired to dispose of his stock in the corporations, he had *496 to sell either to his children or to the corporation issuing the stock, and a method was set up for valuing the interest sought to be sold.
Arthur refused to sign the agreement. He insisted and still insists that the Fortugno enterprises constitute a single integrated partnership operation, whether or not any phase thereof was conducted in corporate form, and that he is entitled to be paid in cash for his interest, particularly in consequence of the court's order of dissolution. He has maintained that position to the point where he refuses to accept from Oxford Royal the more than $10,000 in salary due him for work performed at that company  he insists he be paid by Hudson Manure. And so with a Cadillac car he bought with his own funds; he wants reimbursement from the partnership, pointing to the fact that the other partners had cars purchased for them by the partnership.
The reasons for Arthur's stand are readily understandable. As a member of a partnership that owns several corporations he has an effective voice in partnership policy and operation, but as a minority stockholder he could be overruled by a majority vote. Further, his minority interest in a closed family corporation does not have a market value commensurate with its actual value. The court having ordered a dissolution, Arthur contends he is entitled to an effective dissolution  one that will permit him to get out of the Fortugno operation completely and forever.
We have noted the trial court's holding as to whether the corporations are partnership assets, and will consider that holding in some detail in our discussion of the individual corporations. As to the partnership agreement, the trial court held that distribution "in specie," as called for by the agreement, meant distribution in kind, namely, not in money alone but in the actual division and distribution of the physical assets themselves. However, this construction of "in specie" actually received no application in the final determination of the court insofar as shares of corporate stock were concerned. In the first place, it will be remembered that the court held four of the corporations not to *497 be assets of the partnership. Secondly, in treating of Hudson Farms, Inc., the court, in ordering the sale of that corporation as a partnership asset, permitted the alternatives of sale of (a) its capital stock or (b) assets in bulk or (c) assets in lots. True distribution "in specie" would have meant physical partition of the land and other divisable assets.

II.
Before proceeding to discuss the correctness of the trial court's conclusions in the light of a more detailed exposition of the formation and operation of the several corporations, it is helpful to recall certain basic principles of partnership law.
Our statutes provide that all property originally brought into a partnership or subsequently acquired in any way on its behalf is partnership property and, unless a contrary intention appears, property acquired with partnership funds is partnership property. Uniform Partnership Act, R.S. 42:1-8(1) and (2). The problem of determining what is and what is not partnership property is accurately stated in 1 Barrett and Seago, Partners and Partnerships, Law and Taxation (1956), c. 3, § 3.2, pp. 174-176:
"There have been many cases involving the question of what was and what was not partnership property. In deciding these cases the courts have almost invariably sought to ascertain the intent of the partners, be it expressed or implied, from the nature and form of the transaction. Coupled with this same line of inquiry is the question of what motivated the partners (partnership) so far as the property in question is concerned.
It may be said that when partnership funds are used to purchase property that the property so acquired is presumed to be partnership property. The fact that the title to such property is taken in the name of an individual partner or partners or in the name of third person does not change this result. The presumption stated above is rebuttable. * * *
For real property to be partnership property it must have been purchased with partnership funds and the use thereof must be by the partnership.
In considering the subject of what is the separate property of the partners and what is partnership property we come again to the *498 matter of the intention of the parties. This intention is to be determined from the partnership agreement, the conduct of the parties and, to a lesser extent, by the use that is made of the property. * * *"
In Bacon v. Bacon, 7 N.J. Super. 182, 183-184 (App. Div. 1950), affirmed 6 N.J. 117, 125-127 (1951), an action between husband and wife in which it was found that they were equal partners in a business, real property purchased in the sole name of the wife was held to be partnership property. The money used for the purchase of the property came from the partnership, and passed directly to the vendor. It is important to note two points in this case: (1) the strong presumption of gift where a husband pays for realty placed in the wife's name was completely displaced by the presumption that property purchased with partnership funds belongs to the partnership; and (2) the legal theory of separate and distinct ownership of partnership and individual property was strictly enforced. In Stark v. Reingold, 18 N.J. 251, 267 (1955), certain real estate was found to be an asset of the partnership because the deposit for its purchase was paid equally by the partners and necessary repairs were paid for by the partnership, even though title was taken in the names of one of the partners and his wife, and this partner individually paid off a mortgage lien.
Less than all the partners in a partnership may not bind the partnership by an act or acts not performed for the purpose of carrying on the usual business of the partnership, unless authorized by the other partners. Uniform Partnership Act, R.S. 42:1-9. This applies particularly to a situation where one or several partners, but not all, seek to incorporate a partnership and transfer the assets of the partnership to the new corporation. Kanzler v. Smith, 123 N.J. Eq. 602 (E. & A. 1938); Height v. Democratic Women's Luncheon Club of N.J., 131 N.J. Eq. 450, 453 (Ch. 1942); Great Council, etc. v. Mohican Tribe, etc., 92 N.J. Eq. 593 (Ch. 1921); Miller v. Miller, 80 N.J. Eq. 47 (Ch. 1912); 8 Fletcher Cyclopedia Corporations (rev. ed. 1931), § 3994, p. 342. Where such acts are not ratified by *499 the other partners, the property remains that of the partnership and may be traced into the corporation; the new corporation need not be dissolved (it may remain the organization of the partners who incorporated it), but no assets of the partnership can remain in it. 8 Fletcher, op. cit., § 4008, p. 377, and the cases last cited. It is, of course, basic that no one can be made a stockholder in a corporation without his knowledge and consent. Besson v. Stevens, 94 N.J. Eq. 549, 565 (E. & A. 1923).
Co-partners must deal with each other with trust, confidence and good faith; there can be no secret advantages or benefits. A partner has a fiduciary duty to share with the partnership those business opportunities clearly related to the subject of its operations. Stark v. Reingold, 18 N.J. 251, 261 (1955); Bowne v. Windsor, 106 N.J. Eq. 415, 416 (Ch. 1930), affirmed 108 N.J. Eq. 274 (E. & A. 1931). In Stark the court quoted Justice Cardozo's celebrated statement of the duty owed by a fiduciary, made while he was Chief Judge of the New York Court of Appeals in Meinhard v. Salmon, 249 N.Y. 458, 463-464, 164 N.E. 545, 546, 62 A.L.R. 1 (1928). It bears repeating:
"Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the `disintegrating erosion' of particular exceptions. Wendt v. Fischer, 243 N.Y. 439, 444, 154 N.E. 303. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court."

III.
Defendant Arthur Fortugno argues that the corporations here involved may be valid corporations, lawfully created and existing with no fraudulent scheme involved, but from *500 the standpoint of ownership in relation to dissolution of the family partnership they constitute partnership assets. He contends that he is not so much concerned with "piercing the corporate veil," in the usual sense, as in having this court determine that the corporations, together with their assets and value, are in fact assets of the partnership. He claims that the proofs clearly establish the close affiliation among the several family concerns. Although cast in corporate guise, their respective workings, he insists, were otherwise, the only semblance of each to a corporation being little more than the filing of papers and the name used.
As additional proof that all of the companies were considered part of one family unit, he points to a proposed settlement agreement of February 2, 1957, signed by all but himself, which makes the corporations a party thereto, and wherein they are referred to by the phrase "herein collectively called the Fortugno Corporations." Although drawn and executed more than a year after this action began and dissolution was ordered, Arthur contends that it exhibits the same unity between all the Fortugnos concerned as was evidenced in the operations of the partnership theretofore, the family members acting inter sese as a single enterprise with one individual, Anthony, still largely responsible for the business and running its affairs.
The general rule is that a corporate entity may not be disregarded. But the principle is not without its exceptions. In refusing to go behind the corporate form, the trial judge laid stress on the lack of any allegation of fraud in the setting up of the corporations. However, a court of equity is always concerned with substance, and not merely form.
We are not concerned here with claims of third persons. Cf., for example, Frank v. Frank's, Inc., 9 N.J. 218 (1952) (widow seeking to establish dower in corporate property); Ross v. Pennsylvania R.R. Co., 106 N.J.L. 536 (E. & A. 1930) (death claim). The only persons interested are the owners of closed family corporations, and in such a circumstance there should be no automatic application of the general *501 rule. Cf. Whitfield v. Kern, 122 N.J. Eq. 332, 347 (E. & A. 1937). Equity will go behind the corporate form where necessary to do justice.
A partnership may, of course, be created for the prime purpose of buying and selling shares of stock. In such a situation a partnership goes no further than the stock itself; the partners are not entitled to be considered the equivalent of owners of the corporations in which the stock is held. But the partnership in this case was not one engaged in the buying and selling of corporate shares; it conducted a manure business in all of its out-branches. As we shall see, the partnership did not obtain the corporate shares that it did simply as an investment, but acquired them naturally in the course of the evolution and expansion of its prime business. The partnership's stock ownership was not for the purpose of participating in corporate affairs in the normal manner, but was resorted to simply in order to make each corporation an instrumentality or department of the integrated family enterprise. In similar situations courts have looked through the form to the reality, as if the corporation agency did not exist, and dealt with them as the justice of the case required. Cf. Schmid v. First Camden Nat. Bank & Trust Co., 130 N.J. Eq. 254, 260-261 (Ch. 1941), and cases cited; Newark Ladder & Bracket Sales Co., Inc., v. Furniture Workers Union, etc., 125 N.J. Eq. 99, 102-103 (Ch. 1939), and cases cited; Chicago, M. & St. P.R. Co. v. Minneapolis C. & C. Ass'n, 247 U.S. 490, 501, 38 S.Ct. 553, 62 L.Ed. 1229 (1918).
If, as Arthur contends the corporations about to be discussed were merely mechanical devices for the achievement of the partnership purpose  part of a single, integrated family enterprise  mere lack of precedent should not stand as a bar to equitable relief necessary to achieve a just result. Van Duyne v. Vreeland, 12 N.J. Eq. 142, 158 (Ch. 1858); Vanderbilt v. Mitchell, 72 N.J. Eq. 910, 923 (E. & A. 1907); Sears, Roebuck & Co. v. Camp, 124 N.J. Eq. 403, 412 (E. & A. 1938).

*502 IV.
The court here reviewed in some detail the formation, history and mode of operation of each of the five corporations in relation to the partnership, reaching the conclusion summarized in Part V following. It also concluded that Anthony must (as the trial court held) return $65,000 to Hudson Farms, Inc., plus interest received, Arthur not having adequately substantiated his claim that $93,891.79 and not $65,000 had been diverted by him.]

V.
In the light of our detailed consideration of the operation of the several corporations and the principles enunciated under parts II and III of this opinion, and summarizing the separate conclusions expressed hereinabove, we conclude that the trial court was in error in holding that Fortugno Realty Company, C. & C. Trucking, Inc., Lescarboura Mushroom Company, and Oxford Royal Mushroom Products, Inc., are not assets of the partnership, Hudson Manure Company. They were all incorporated or purchased with partnership money, their assets either came directly from the partnership or were purchased with partnership funds, and they were in many respects treated as a single enterprise and used as a convenient method to further the partnership interests. Prior to the institution of this action, only the realty company stock (Hudson Farms, Inc. aside) actually was held by the partners individually  and we have seen that this was in name only. Applying the principles, stated earlier, of determining what is partnership property, we conclude that the four named corporations were and presently are assets of the partnership, Hudson Manure Company. With regard to Hudson Farms, Inc., the real and personal property of the corporation belong to the partnership and are held in trust for it. There was never either consent by all of the partners to its formation, or ratification.
*503 Does the 1940 partnership agreement require that upon dissolution of the partnership distribution be of the shares of corporate stock, or should all its assets be liquidated and the proceeds distributed in cash? A third possibility is suggested by Arthur, to be offered as an alternative option to the other partners should they prefer it to an outright liquidation  a complete accounting and valuation of the entire Fortugno enterprise followed by an order that Anthony and the others pay Arthur his one-eighth share.
The written partnership agreement is the measure of the partners' rights and obligations. Hilton v. Hilton, 89 N.J. Eq. 182, 184 (E. & A. 1918). The pertinent part of paragraph IX of the agreement states, "and all the moneys and other assets of the partnership, then remaining, shall be divided in specie, between the parties, share and share alike." We concur in the trial court's finding that "in specie" means in kind, in the context of the partnership agreement. Cf. Craighead v. Pike, 58 N.J. Eq. 15, 22-23 (Ch. 1899), affirmed c.b. 60 N.J. Eq. 443 (E. & A. 1900); Kelley v. Shay, 206 Pa. 205, 214, 55 A. 925, 927 (Sup. Ct. 1903); Ruggles v. Buckley, 158 F. 950, 957 (6 Cir. 1908).
We hold, however, that the partnership agreement does not bind us to a distribution of the corporate stock itself. The agreement did not contemplate the transfer of partnership assets into corporations and a subsequent dissolution and distribution of the several corporate stocks, thereby transforming a full partner (here, Arthur) into a minority stockholder, denying him an effective withdrawal from the partnership enterprise upon liquidation, but instead compelling him to remain an unwilling minority stockholder in the several continuing corporations. Distribution upon dissolution under the original partnership agreement had in view distribution in money and tangible goods and not stock in corporations set up as merely mechanical devices for running the partnership enterprise. In any case, we will not order equal distribution of the shares where circumstances would make such a course an inequitable one. Our discussion under part III of this opinion is pertinent here.
*504 The cases cited by respondents, allowing distribution of partnership assets in kind in the absence of a contrary agreement, were decided within the discretion of the court, and each one was so decided because it was the most equitable way of dividing the partnership property. See the Craighead, Kelley and Ruggles cases, above; Watterson v. Knapp, 35 Cal. App.2d 283, 95 P.2d 154, 156 (Dist. Ct. App. 1939); Rinke v. Rinke, 330 Mich. 615, 48 N.W.2d 201, 207 (Sup. Ct. 1951). Kelley v. Shay involved ownership of stock in a natural gas company, apparently not controlled by the partnership. The court found that one partner would have an advantage over the other in bidding for the stock, and so ordered it to be distributed in specie. In Ruggles v. Buckley the partnership owned the stock of a railroad and the court ordered the shares distributed; but in that case there were only two partners and they each kept a 50% interest in the railroad.
Our decision, as in the cases cited above, rests on equitable grounds. Even though Arthur may have contributed the least to the partnership, we do not think he should be compelled to remain in the family enterprises  and that would be the practical effect of ordering a distribution of the capital stock of the corporation. If this be a violation of the partnership agreement  and we do not think it is  it would not be the first time that a court of equity has refused to enforce a provision in an agreement where to do so would be inequitable because of changed circumstances. Cf. Michalski v. Michalski, 50 N.J. Super. 454 (App. Div. 1958), certification denied 27 N.J. 278 (1958). The key to the changed circumstances here present is, of course, the repeated breach by Anthony of his fiduciary duty as a co-partner to his family following the execution of the partnership agreement, resulting in the complicated corporation-partnership arrangements and operations.
The testimony of Anthony, Arthur and Alfred leads to the inescapable conclusion that all the corporations formed a single whole with the partnership. They were treated as a single enterprise. It is therefore not unfair *505 to the remaining partners to treat them as truly partners upon dissolution. Only the partners are involved in this litigation; there are no creditors or other third parties. In such cases we may ignore the corporate entity in order to do that which is just. (See part III above.) It offends our sense of fair play to leave Arthur at the mercy of his partners, even though they may have treated him equitably in the past. We therefore conclude that the assets of the partnership, including those of all the corporations, should be liquidated, and the proceeds distributed in cash.
We cannot order the remaining partners to buy out Arthur's interest. Weissman v. Hankin, 154 Pa. Super. 12, 34 A.2d 907 (Super. Ct. 1943). However, recognizing that a forced sale of the partnership will destroy a great part of the value of the business we approve the alternative proposal to the partners submitted by Arthur at the oral argument and referred to above. If the opposing partners will agree to the entry of an order for the appraisal of the partnership under the direction of the court and directing them to pay Arthur one-eighth of the valuation determined upon, such an order will be entered. Otherwise, there will be a liquidation by sale of all the partnership assets, including those owned by the several corporations. The parties will indicate their choice to the trial court within 20 days of the date of this decision. That the alternative granted is novel does not deter us, for it is "no objection to the exercise of jurisdiction that, in the ever-changing phases of social relations, a new case is presented and new features of wrong are involved." Earle v. American Sugar Refining Co., 74 N.J. Eq. 751, 761 (Ch. 1908).
Our conclusions dispose of defendants' cross-appeal from that part of the trial court's order relating to the sale of Hudson Farms, Inc. Although Arthur urges that the sale, if it is held, should not take place in Jersey City but in Pennsylvania where the business is located and the best market available, we will not disturb the trial court's determination in this aspect. Should it eventuate that the partnership and its assets must be sold on liquidation, the trial *506 court may in its discretion order the sale of not only Hudson Farms, Inc., but all the other assets, in Jersey City or at such other place or places as it may deem advisable.
Arthur's claim for the balance of salary still owing him is granted; its presence on the books of Oxford Royal validates its existence. His demand that he be reimbursed for his Cadillac automobile is denied, there being no adequate proof to support the merits of such a claim.
To insure a disinterested and impartial dissolution of the partnership, or appraisal, as the case may be, the trial court will on remand appoint new trustees having no interest in the litigation. The master heretofore appointed to take possession of the capital stock and assets of Hudson Farms, Inc., and to conduct the sale of that corporation, should thereupon be discharged.
The order below is reversed insofar as it is inconsistent with this opinion; in all other respects it is affirmed. The cause will be remanded for such further proceedings as may be necessary in light of our conclusions.