**Don W. CRISP, Trustee of the Caroline Hunt Trust Estate, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 92–870T.

United States Court of Federal Claims.

Sept. 7, 1995.

19. Tr. at 643 (8–25); 644 at (1–25); 645 at (1–9).

Buford P. Berry, Dallas, Texas, for plaintiff. Barbara B. Ferguson and William R. Mureiko, of counsel.

Arthur C. Hoene, with whom were Assistant Attorney General Loretta C. Argrett, Mildred L. Seidman, Chief, and William K. Drew, Senior Trial Attorney, Washington, D.C., for defendant.

*OPINION*

ANDEWELT, Judge.

I.

In this tax refund action, plaintiff, Don W. Crisp, trustee of the Caroline Hunt Trust Estate (the Trust or Trust Estate), seeks a refund of $2,993,572.81 [1] for income taxes the Trust allegedly overpaid for the tax year ending June 30, 1987, and the shortened tax period ending December 31, 1987.[2]

In 1935, Caroline Hunt's parents, H.L. and Lyda Hunt, established the Trust Estate through an "Articles of Agreement and Declaration of Trust" (the Trust Agreement). The Trust Agreement provides that the trustee may, at his or her discretion, make periodic payments to Caroline Hunt during her lifetime and then, for the next 21 years after her death, make periodic payments to Caroline Hunt's heirs. At the end of the 21-year period following Caroline Hunt's death, the Trust Agreement obliges the trustee to dissolve the Trust and disburse the assets to Caroline Hunt's heirs.

I.R.C. § 641 obliges trusts to pay taxes on trust income. When calculating taxable trust income for any given tax year, I.R.C. § 661 permits a deduction from trust income of all distributions made to trust beneficiaries during that tax year up to the amount of the trust's distributable net income (DNI).[3] I.R.C. § 643(a) sets forth the method for calculating a trust's DNI.

For the two tax periods in issue here, the Trust distributed to Caroline Hunt $4.5 million and $1.6 million, respectively. Pursuant to I.R.C. § 661, the Trust deducted from its income the full amounts distributed to Caroline Hunt because the Trust's DNI for these periods, as calculated by the trustee, exceeded the amounts distributed. In calculating the Trust's DNI for these two periods, the

---

1. Plaintiff's original claim for refund included an additional $16,988 for alleged overpayments involving the calculation of depletion on certain assets owned by the Trust Estate. During the course of this litigation, however, the Supreme Court resolved the depletion issue in a manner adverse to plaintiff. *See United States v. Hill*, 506 U.S. 546, 113 S.Ct. 941, 122 L.Ed.2d 330 (1993).

2. Plaintiff shortened the fiscal tax year beginning July 1, 1987, to December 31, 1987, in compliance with the Tax Reform Act of 1986, Pub.L.No. 99–514, Title XIV, § 1403, 100 Stat. 2713 (codified at I.R.C. § 645(a)), which required all trusts to conform their tax years to the calendar year beginning after December 31, 1986.

3. I.R.C. § 661(a) provides, in pertinent part, as follows:

> (a) Deduction.—In any taxable year there shall be allowed as a deduction in computing the taxable income of an estate or trust ... the sum of—
> (1) any amount of income for such taxable year required to be distributed currently (including any amount required to be distributed which may be paid out of income or corpus to the extent such amount is paid out of income for such taxable year); and
> (2) *any other amounts properly paid* or credited or required to be distributed for such taxable year;
> but such deduction shall not exceed the distributable net income of the estate or trust.
> (Emphasis added.)

trustee included within the DNI all capital gains credited to the Trust's capital account by ZH Associates (ZH), a limited partnership in which the Trust is a limited partner.

After conducting an audit, the Internal Revenue Service (IRS) concluded that the trustee had improperly included the ZH capital gains in the Trust's DNI. When the IRS recalculated the Trust's DNI to exclude these capital gains, the DNI for the respective tax periods fell to $2,665,300 and $600,252. Because the Trust's distributions to Caroline Hunt exceeded the recalculated DNI, and because I.R.C. § 661 provides that any deduction from trust income "shall not exceed the [DNI]," the IRS recalculated the Trust's tax burden to include, as taxable income, the amount of the Trust's distributions to Caroline Hunt that exceeded the reduced DNI. As a result, the Trust owed taxes, penalties, and interest in the amounts of $2,895,496 and $98,076, respectively.

Plaintiff paid the taxes, penalties, and interest calculated by the IRS, and thereafter filed the instant suit to secure a refund. This action is presently before the court on the parties' cross-motions for summary judgment on the issue of whether the trustee properly included in the Trust's DNI the ZH capital gains credited to the Trust. There are no material issues of fact in dispute. For the reasons set forth below, plaintiff's motion for summary judgment is granted and defendant's cross-motion is denied.

## II.

The Trust Estate and Robert E. Zoellner (Zoellner) formed ZH pursuant to the New Jersey Uniform Limited Partnership Act and through a January 1, 1982, "Agreement of Limited Partnership" (the Partnership Agreement). The Partnership Agreement designated the Trust as the sole limited partner and Zoellner as the general partner. The Partnership Agreement was later amended to substitute Zoellner Management

Company, Inc., of which Zoellner is president, as the general partner.

The Partnership Agreement describes ZH's business as follows:

> The purposes of the Partnership are to engage in trading for its own account, including to deal in arbitrage, hedge arbitrage, option arbitrage, international securities arbitrage (but not currency or commodities arbitrage) and hedge trading and securities trading in connection therewith and otherwise to deal in securities being traded in connection therewith....

ZH engaged primarily in "deal arbitrage" which involves the purchase of securities sought in cash tender offers, exchange offers, or mergers and then the tendering of those securities for cash or new securities.[4] ZH also engaged in option arbitrage and hedge trading. Option arbitrage seeks, *inter alia*, to capture profits derived from the disparity between the open-market share price of a particular stock and the market price for options to purchase or sell that same stock. Hedge trading involves, *inter alia*, establishing securities positions in one industry and offsetting those positions by taking long or short positions in securities of another industry. ZH received some cash dividends as a consequence of owning securities, but ZH's primary focus was to buy and sell securities in an attempt to profit from the sudden swings in market value that resulted from the numerous mergers and acquisitions which were prevalent in the 1980s.

Pursuant to the Partnership Agreement, Zoellner, the original general partner, contributed $1 million to ZH and the Trust, the sole limited partner, contributed $5 million. The Partnership Agreement directed the allocation of ZH's profits and losses as follows: ⅚ of the net profits shall be credited to the capital account of the limited partner and ⅙ to the capital account of the general partner, and ⅚ of the net losses shall be debited from the capital account of the limited partner and ⅙ from the capital account of the general partner. The Partnership Agreement gave

---

4. Shares of a company subject to a tender offer typically sell at a discount to the amount of the tender offer. This discount, *inter alia*, reflects the uncertainty that the deal will consummate and the offeror will actually purchase the shares at the tender price. Deal arbitrage attempts to capture, as profit, the value of that discount by purchasing securities subject to a tender offer, and if the deal consummates, tendering the shares at the full price offered.

the general partner the exclusive authority to manage and control the operations of ZH, including the execution of investment decisions.[5] The general partner could, at his discretion, distribute profits to the two individual partners when the partners' combined capital accounts exceeded the initial $6 million combined contribution. Each partner had the right, upon 180 days' notice to the other partner, to demand dissolution of the partnership and distribution of the capital accounts, subject to the payment of partnership expenses and contingencies related to dissolution.

### III.

Congress created DNI specifically to deal with the taxation of estates and trusts and their beneficiaries. *See* Treas.Reg. § 1.643(a)–0. I.R.C. § 661(a) employs DNI to determine the proportions of the income tax burden borne by the trust or estate and by its beneficiaries. I.R.C. § 643(a) defines DNI as follows:

> (a) Distributable net income.—[T]he term "distributable net income" means, with respect to any taxable year, the taxable income of the estate or trust computed with the following modifications....

The listed modifications include deductions for distributions, personal exemption, capital gains and losses, extraordinary dividends and taxable stock dividends, tax-exempt interest, and income of a foreign trust. With respect to capital gains and losses, I.R.C. § 643(a)(3) requires a trustee, when calculating DNI, to exclude capital gains from trust income under the following circumstances:

> Gains from the sale or exchange of capital assets shall be excluded to the extent that such gains are allocated to corpus and are not (A) paid, credited, or required to be distributed to any beneficiary during the taxable year, or (B) paid, permanently set aside, or to be used for the purposes of section 642(c) [which relates to charities].

The legislative history of the Internal Revenue Code explains Congress' rationale for including capital gains in DNI except when the gains are allocated to corpus and not paid, credited, or required to be distributed. The pertinent House Report states:

> Subsection (a) defines the term "distributable net income" to mean the taxable income of the estate or trust with certain modifications. This concept of [DNI] serves the general purposes of limiting the additional deductions allowed to estates and trusts (under sections 651 and 661) for amounts paid, credited, or required to be distributed to beneficiaries and also of determining how much of an amount distributed or required to be distributed to a beneficiary will be taxed to him. In effect, the concept of [DNI] gives statutory expression to the principle underlying the taxation of estates and trusts, that is, that these separate taxable entities are only conduits through which income flows to the beneficiaries except where income is accumulated by the estate or trust for future distribution.

> \* \* \* \* \* \*

> To the extent that gains from the sale or exchange of capital assets must be allocated to corpus and are not (A) paid or credited to any beneficiary during the taxable year or (B) paid, permanently set aside or to be used for the purposes specified in section 642(c) (charitable deduction), they are excluded from the computation of [DNI]. The effect of this modification is to tax capital gains to the estate or trust where the gains must be added to principal. However, where the gains, though allocable to corpus, are actually distributed to beneficiaries during the taxable year— for example, in the year of termination of the trust—then the gains are included in the computation of [DNI].

---

5. Article IV of the Partnership Agreement, entitled "Management," provides, in pertinent part:
 Section 4.1. *General Powers of General Partner.* The General Partner shall have exclusive management and control of the business of the Partnership and shall have the authority, in accordance with the terms and conditions of this Agreement, to make and execute investment decisions and take such action related thereto as he may deem necessary or advisable for the best interests, benefit and advantage of the Partnership. The Limited Partner shall not take part in the control of the business of the Partnership in any way.

H.R.Rep. No. 1337, 83rd Cong., 2d Sess., at 194–95 (1954), *reprinted in* 1954 U.S.C.C.A.N. 4025, 4333. Thus, unlike a corporate structure which can be subject to double taxation, with the corporation first paying tax on its income and then the shareholder paying a second tax when it receives a cash dividend distribution from the corporation, Congress anticipated that when a trust is involved, capital gains distributed to trust beneficiaries in the year earned would be taxed only once, as income to the beneficiaries. The definition of DNI in I.R.C. § 643(a) and its use in I.R.C. § 661 as a ceiling on the deductibility of distributions permit a trust to function as a conduit in that the statutes allow the trust to deduct from trust income capital gains distributed to its beneficiaries during the tax period in which the gains were earned.

Treas.Reg. § 1.643(a) implements I.R.C. § 643(a) and defines DNI as "the taxable income (as defined in section 63) of the estate or trust, computed with the modifications set forth in §§ 1.643(a)–1 through 1.643(a)–7." Regarding capital gains, Treas.Reg. § 1.643(a)–3 provides:

> (a) [G]ains from the sale or exchange of capital assets are ordinarily excluded from [DNI], and are not ordinarily considered as paid, credited, or required to be distributed to any beneficiary unless they are:
>
> (1) Allocated to income under the terms of the governing instrument or local law by the fiduciary on its books or by notice to the beneficiary, [or]
>
> (2) Allocated to corpus and actually distributed to beneficiaries during the taxable year. . . .

The two alternative allocations to which the regulation refers—income and corpus (alternatively referred to as principal)—are the two possible allocations of funds within a trust. The term "income" as used in Treas. Reg. § 1.643(a) refers to "the amount of income of an estate or trust for the taxable year determined under the terms of its governing instrument and applicable local law." Treas.Reg. § 1.643(b)–1. Hence, under

Treas.Reg. § 1.643(a)–3, capital gains are includable in DNI if they are either (1) allocated to income or (2) allocated to corpus and actually distributed to the beneficiary during the tax year.

In the instant case, plaintiff contends that he properly applied Treas.Reg. § 1.643(a) when he included in the Trust's DNI the ZH capital gains because the Trust's auditor had allocated these gains to income rather than to corpus. In response, defendant acknowledges that plaintiff's auditor allocated the ZH capital gains to income, but contends that this allocation was erroneous, *i.e.*, that the Trust Agreement (the trust instrument) and the applicable local law (Texas state law) required instead that the trustee allocate the capital gains to corpus. Defendant appreciates that under Treas.Reg. § 1.643(a)–3 corpus that is properly distributed to the beneficiary in the tax year is includable in DNI. Defendant argues correctly, however, that because the instant trust instrument specifically precludes any distribution of corpus to the beneficiary, the ZH capital gains cannot be classified as distributed corpus includable in DNI under Treas.Reg. § 1.643(a)–3. Thus, the crucial issue on summary judgment under the controlling statute and regulation is whether the trustee had authority to distribute to Caroline Hunt the capital gains earned by ZH and credited to the Trust. If the trustee had such authority, then the ZH capital gains were not corpus and the trustee properly allocated the gains to income and properly included the gains in the Trust's DNI.

As quoted above, Treas.Reg. § 1.643(a)–3(a)(1) provides that gains from the sale or exchange of capital assets are includable in DNI if the gains are "[a]llocated to income under the terms of the governing instrument or local law by the fiduciary on its books. . . ." In the instant case, Texas state law is the applicable local law, and the Texas Trust Code provides that, to the extent a trust dictates such an allocation, a trustee shall allocate receipts between income and principal according to the provisions of the trust instrument.[6] Therefore, both Treas.

---

**6.** Section 113.101 of the Texas Trust Code provides:

> (a) A trustee shall administer the trust with due regard for the interests of income benefi-

Reg. § 1.643(a)–3(a)(1) and the applicable local law point this court initially to the Trust Agreement. If the Trust Agreement dictates the allocation of the ZH capital gains to income, or alternatively to corpus, then that allocation would be determinative. If the Trust Agreement fails to allocate the gains to either income or corpus, then the court must consult the other applicable provisions of Texas state law.

### IV.

The Trust Agreement contains a series of introductory clauses, a series of articles that establish the powers and rights of the trustee (Article I), the advisory board (Article II), and the beneficiary (Article III), and then an article that contains miscellaneous provisions (Article IV). Article I, Section 4(b), expressly precludes distribution of corpus. ("[T]he corpus of [the] Trust Estate shall never be diminished through a distribution to the Beneficiary.")[7] Although the trustee may not distribute corpus, the trustee may, at his or her discretion, distribute "net profits" or "net earnings," two terms the Trust Agreement appears to use synonymously. Article IV, Section 4, referring to the trustee's distribution of net profits, provides:

> The Beneficiary may receive from time to time during the life of this trust, such portions of the net profits accruing from time to time to this Trust Estate, as the Trustee, acting with the advice and consent of the Advisory Board, may see fit to pay over and deliver to the Beneficiary. Net profits shall be determined by the annual audits as provided for herein, and the Trustee shall never in any event pay to the Beneficiary, during any one calendar year, any sum in excess of the Net Profits

for the preceding calendar year. No duty is imposed upon the Trustee to make such distribution of net profits, but the power is conferred upon him, acting with the advice and consent of the Advisory Board, so to do, and in exercising this discretion said Trustee and Advisory Board shall give full consideration to the interest of both the Beneficiary and this Trust Estate.

Article III, Section 1, referring to the trustee's distribution of net earnings, provides: "The beneficiary shall have no right to the corpus of the Trust property ... and the Beneficiary shall have no right with respect to [the] Trust other than to receive distribution of net earnings awarded her by the Trustee with consent of the Advisory Board, as is elsewhere herein provided...."

Because the trustee may never distribute corpus but may distribute net profits and net earnings, the Trust Agreement necessarily treats net profits and net earnings as distinct from corpus. Treas.Reg. § 1.643(a)–3, however, employs only two classifications—trust corpus and trust income. Therefore, to the extent that the Trust Agreement allocates the ZH capital gains to net profits or net earnings, in applying the regulation, the allocation will be treated as an allocation to income. Hence, the court must determine whether the Trust Agreement dictates the allocation of ZH capital gains to either net profits or net earnings or rather to corpus. As explained above, if the Trust Agreement dictates a particular allocation, then that allocation would control.

### V.

The Trust Agreement does not define the terms "net profits" and "net earnings." In

---

ciaries and remaindermen with respect to the allocation of receipts and expenditures by crediting a receipt or charging an expenditure to income or principal or partly to each:
 (1) in accordance with the terms of the trust instrument;
 (2) in the absence of any contrary terms of the trust instrument, in accordance with this subtitle; or
 (3) if neither of the preceding rules of administration is applicable, in accordance with what is reasonable and equitable in view of the interests of those entitled to income and to principal.

 (b) If the trust instrument gives the trustee discretion in crediting a receipt or charging an expenditure to income or principal or partly to each, no inference arises from the fact that the trustee makes an allocation contrary to this subtitle.

7. Article III, Section 1, when defining the rights of the beneficiary, reiterates the settlors' intent to preclude distribution of corpus during the life of the beneficiary as follows: "The beneficiary shall have no right to the corpus of the Trust property...."

the absence of such definitions, the settlors' intent in 1935 would seem best unveiled by consulting contemporaneous law dictionaries. *See Fox v. Thoreson,* 398 S.W.2d 88, 92 (Tex. 1966) ("language used by the parties should be given its plain grammatical meaning unless it definitely appears that the intention of the parties would thereby be defeated"); *see also Transamerica Ins. Co. v. Frost Nat'l Bank,* 501 S.W.2d 418, 423 (Tex.Civ.App., Beaumont 1973), *writ ref'd n.r.e.* (1974). *Black's Law Dictionary* (3d ed. 1933) presents two similar definitions of net profits.

NET PROFITS. This term does not mean what is made over the losses, expenses, and interest on the amount invested. It includes the gain that accrues on the investment, after deducting simply the losses and expenses of the business.

*Id.* at 1239.

### Net profits

Theoretically all profits are "net." But as the expression "gross profits" is sometimes used to describe the mere excess of present value over former value, or of returns from sales over prime cost, the phrase "net profits" is appropriate to describe the gain which remains after the further deduction of all expenses, charges, costs, allowance for depreciation, etc.

*Id.* at 1440 (citation omitted).[8]

The 1933 edition of *Black's* defines net earnings, as follows:

The gross earnings of a business or company are the total receipts before deducting expenditures. Net earnings are the excess of the gross earnings over the expenditures defrayed in producing them, and aside from and exclusive of capital laid out in constructing and equipping the works or plant.

*Id.* at 635.

Although the dictionary definitions do not specifically refer to partnerships or, more specifically, to the treatment of partnership profits credited to a limited partner, the definitions are broad enough to encompass such profits. Upon forming the ZH limited partnership, the Trust, in an apparent effort to profit from Zoellner's stock trading expertise, essentially became a passive investor in a business run by Zoellner. The Trust and Zoellner created ZH by combining Zoellner's assets with the Trust's assets. The Partnership Agreement gave Zoellner full control over the operations of ZH, including the selection of assets to be purchased and sold. In this setting, the profits earned by ZH and credited to the Trust essentially constitute profits earned by the Trust on an investment in a limited partnership. Such profits fit within the pertinent dictionary definitions of net profits and net earnings in that they are appropriately characterized as "gain[s] that accrue[d] on [an] investment" (*id.* at 1239), as the "excess of present [Trust] value over former value" (*id.* at 1440), and as the "excess of the gross [Trust] earnings over . . . expenditures" (*id.* at 635). Although the Internal Revenue Code's classification of such profits as capital gains rather than ordinary income may affect the ultimate rate of taxation of these profits, such a classification does not affect the allocation of these profits to either net profits or net earnings or alternatively to corpus. Instead, the Trust Agreement and Texas state law control that allocation.

Hence, the terms "net profits" and "net earnings," as employed by the Trust Agreement and as defined in the contemporaneous law dictionaries, encompass the profits earned by ZH and credited to the Trust, regardless of whether the Internal Revenue Code classifies these profits as ordinary income or as capital gains.

### VI.

Defendant argues that the ZH profits credited to the Trust could not properly be

---

8. The 1933 edition of *Black's* defines profit, as follows:

The advance in the price of goods sold beyond the cost of purchase. The gain made by the sale of produce or manufacturers, after deducting the value of the labor, materials, rents, and all expenses, together with the interest of the capital employed.

The excess of receipts over expenditures; that is, net earnings.

The receipts of a business, deducting current expenses; it is equivalent to net receipts.

An excess of the value of returns over the value of advances. The same as net profits. *Id.* at 1439–40 (citations omitted).

classified as net profits or net earnings because these profits fit squarely within the definition of corpus provided in the Trust Agreement. Upon review, however, the Trust Agreement contains no provision that directs the trustee to treat as corpus profits such as those credited to the Trust from the ZH limited partnership.[9]

The Trust Agreement delineates the metes and bounds of the corpus of the Trust Estate in a paragraph preceding Article I, which provides:

> WHEREAS, it is contemplated that *said Trustee* of said Caroline Hunt Trust Estate, with the consent of the Advisory Board, *may*, from time to time, hereafter *acquire additional property, through gift, devise, purchase or exchange*, real, personal or mixed, of divers and sundry kinds, all of *which, together with said 1800 shares of the capital stock of Hunt Production Company* already acquired by said Trustee for said Beneficiary, *is intended to create the corpus of a Trust Estate* for the use and Benefit of said Caroline Hunt, and the legal title to all of which said property shall be in said Trustee and his successors, with and for the purposes herein stated, and any and all of said property of whatsoever kind or character, whether real, personal or mixed, together with the accretions thereto, income thereon, or proceeds thereof, shall be by said Trustee held in a trust capacity as herein defined;

(Emphasis added.) Upon analysis, this definition of corpus does not encompass profits from the Trust's share of a limited partnership such as ZH.

Under New Jersey state law, which controls the operation of ZH, a limited partnership interest constitutes personal property. N.J.Stat.Ann. § 42:2A–12. Because the Partnership Agreement required the Trust to invest $5 million to secure its limited partnership interest in ZH, the trustee can fairly be said to have "acquire[d this] additional property [*i.e.*, the limited partnership] through ... purchase or exchange." The Trust's limited partnership interest in ZH, therefore, fits within the Trust Agreement's definition of corpus. Such a conclusion, however, does not support the further conclusion that profits derived from the Trust's interest in ZH also fit within the Trust Agreement's definition of corpus.

The ZH profits credited to the Trust resulted from ZH's acquisition and sale of stocks and stock options (hereinafter securities or stocks). These securities do not themselves qualify as corpus under the above-quoted Trust Agreement definition because the Trust did not "acquire" the securities, but rather ZH, a distinct legal entity, acquired the securities.[10] Article I, Section

9. The court recognizes that certain profits that fit within the dictionary definitions of net profits and net earnings may also fit within the Trust Agreement's definition of corpus. For example, if the Trust exchanged corpus for a capital asset, and the capital asset subsequently increased in value and the trustee sold that asset, the provisions of the Trust Agreement relating exclusively to corpus would seem to classify as corpus the entire proceeds from the sale of the asset, including the profit. For such profits that fit within the definitions of net profits and net earnings and also the definition of corpus, the court would have to determine which classification is appropriate based on a reading of the Trust Agreement, the current law, and the law applicable in 1935. Because, as explained below, profits credited to a trust by a joint venture such as ZH do not fit within the Trust Agreement's definition of corpus, there is no basis within the Trust Agreement for not classifying the ZH profits according to the contemporaneous dictionary definitions of the terms the settlors chose to employ. In this regard, limited partnerships were apparently a commonly recognized method of conducting

business in Texas in 1935 when H.L. and Lyda Hunt signed the Trust Agreement. In 1846, the State of Texas adopted a limited partnership act, "An Act for the Regulation of Limited Partnerships," 1st Leg., Laws of Tex. 1585 (May 12, 1846), which remained essentially unchanged until 1955. Given the legal recognition of limited partnerships, if the settlors had intended the terms "net profits" and "net earnings" to have meanings different from those defined in the contemporaneous dictionaries and therefore for profits from limited partnerships to be treated as corpus rather than as net profits, then the settlors seemingly would have so provided in the Trust Agreement.

10. Defendant argues that a partnership is not a separate taxpayer under I.R.C. §§ 701 and 702 and, therefore, a partnership is no more than a conduit through which tax items flow to its partners. There is no dispute, however, that ZH functions as a conduit for tax purposes. Rather, the crucial issue is whether the profits credited by ZH, a distinct legal entity, to the Trust's capital account are allocable by the Trust to

4, of the Trust Agreement states requirements for investments by the Trust and provides:

All investments shall be made and the legal title to all property shall be held, and all property managed, controlled, and disposed of, absolutely by [the] trustee and his successors under this [Trust Agreement], with the advice and consent of the Advisory Board....

Herein, the trustee had the requisite title to and control over the Trust's limited partnership interest in ZH in that the trustee could unilaterally exercise all the rights of a limited partner. The trustee, however, did not have title to or control over the securities purchased by ZH. Rather, as described above, the general partner of ZH solely controlled the operation of the partnership and the purchase and sale of securities. Hence, the securities owned by ZH could not be classified as an investment of the Trust or property of the Trust under Article I, Section 4, of the Trust Agreement and thus cannot be classified as an investment "acquired" by the Trust. This interpretation of the Trust's interest in the ZH assets is consistent with applicable New Jersey state law, which provides that a limited partner does not itself own, possess, or have legal title to the specific assets of the partnership. N.J.Stat.Ann. § 42:1–25; see also Fortugno v. Hudson Manure Co., 51 N.J.Super. 482, 144 A.2d 207 (1958); Mazzuchelli v. Silberberg, 29 N.J. 15, 148 A.2d 8, 11 (1959).[11] Thus, although the Trust "acquired" its limited partnership interest in ZH, the Trust did not "acquire" the securities owned by the partnership and, hence, those securities are not classifiable as corpus. Because the securities themselves are not corpus, it would follow that the ZH

profits credited to the Trust based on the sale of those securities likewise would not be classifiable as corpus in that they are not property "acquire[d] ... through gift, devise, purchase or exchange." [12]

The paragraph preceding Article I of the Trust Agreement that defines corpus includes the provision that "[trust] property, ... accretions thereto, income thereon, or proceeds thereof, shall be ... held in a trust capacity." Because the profits ZH credited to the Trust derived from the Trust's limited partnership interest in ZH, the profits potentially could be characterized as either "income" from the limited partnership or "proceeds" thereof. Thus, the Trust Agreement seemingly obliged the trustee to hold the ZH profits credited to the Trust "in a trust capacity," at least once ZH had distributed those profits to the trustee. Such an obligation to hold distributions in a trust capacity, however, does not also dictate the allocation of such proceeds to corpus. For example, income is one of the listed assets that must be "held in a trust capacity" and defendant has not contended, nor could it reasonably contend, that all income is allocable to corpus. Thus, rather than dictating the allocation of a particular receipt to corpus, the phrase "held in a trust capacity" merely requires the trustee to exercise control over the covered assets. The phrase indicates nothing about whether the trustee must allocate the proceeds to corpus, which the trustee is prohibited from distributing to the beneficiary, or alternatively to net profit or net earnings, which the trustee generally may, but need not, distribute.

To support its position that the ZH profits constitute corpus, defendant also relies upon

---

income or to principal. I.R.C. §§ 701 and 702 offer no instruction as to allocation between income and principal.

**11.** The common law in effect at the time the settlors established the Trust was consistent with this notion that a limited partner does not possess title to partnership property. See, e.g., Appeal of Merchants' Fund Ass'n, 136 Pa. 43, 20 A. 527, 528 (1890) ("[the limited partner] had no title to the land bought by the trustees for the company, as a tenant in common or otherwise, and could neither convey nor encumber it.")

**12.** Defendant cites Texas Trust Code § 113.104(c)(3), which provides that capital gains received by a trust from its investment in a regulated investment company or mutual fund constitute corpus even though the trust does not hold title to the underlying securities. This provision, however, does not support defendant's position because ZH does not qualify as either a regulated investment company or a mutual fund. See 15 U.S.C. § 80a–3(c)(1) (a company "whose outstanding securities ... are beneficially owned by not more than one hundred persons" is not an investment company within the meaning of this statute).

Article I, Section 4(b), of the Trust Agreement which states:

> Likewise, with the advice and consent of said Advisory Board as herein provided, to sell and convey or otherwise use and deal in or dispose of, on such terms as he shall see fit, any part or all of said Trust properties and income therefrom, provided, however, that all considerations paid for all or any part of said Trust Estate shall be the property of said Trust Estate and provided further that the corpus of said Trust Estate shall never be diminished through a distribution to the Beneficiary under said Trust, and the moneys, funds or other properties arising from the sale or other disposition of said properties by said Trustee shall be held and re-invested for the benefit of said Trust Estate.

This provision, however, does not aid defendant. Article I describes the trustee's powers and responsibilities and not the metes and bounds of the corpus of the Trust Estate. Corpus is defined in a paragraph that precedes Article I of the Trust Agreement. In any event, classifying certain funds as part of the Trust Estate or as property of the Trust Estate does not also mean that those funds are necessarily part of corpus. The phrase "Trust Estate" is not synonymous with the term "corpus" because undistributed net profits and net earnings, which clearly are not corpus in the year earned, constitute part of the Trust Estate. Additionally, for the reasons stated above, the securities that produced the receipts at issue were purchased by and were the property of ZH, not the Trust Estate. The proceeds from the partnership's sale of these securities, therefore, would not constitute "considerations paid for all or any part of [the] Trust Estate" or "moneys, funds or other properties arising from the sale or other disposition of [Trust] properties by [the] Trustee." [13]

For the foregoing reasons, the ZH capital gains credited to the Trust fit squarely within the applicable definitions of distributable net profits and net earnings and do not fit squarely within the Trust Agreement's definition of undistributable corpus. Because the Trust Agreement authorized the trustee to distribute the ZH capital gains to Caroline Hunt, for the reasons explained above and on the facts of the instant case, the profits are properly allocable to income and thus includable in DNI under I.R.C. § 643(a)(3) and Treas.Reg. § 1.643(a)–3(a)(1).

## VII.

If the Trust had directly acquired the securities that produced the profits in issue,

---

**13.** Contrary to defendant's contention, the mandate that moneys arising from the disposition of Trust properties "be held and re-invested for the benefit of [the] Trust Estate" does not mean that such moneys necessarily constitute corpus. As described above, because the trustee must also "hold" income for the benefit of the Trust, and income of the Trust unquestionably is not corpus, the mandate that the trustee "hold" moneys for the benefit of the Trust does not dictate that the moneys be held as corpus. Likewise, the additional obligation that the trustee reinvest the moneys does not necessarily mean that the moneys constitute corpus. For example, Article I, Section 10, of the Trust Agreement provides that the trustee must determine the net profits available for distribution based on annual audits. Thus, funds earned by the Trust shortly after an annual audit, including income in the form of interest or dividends, would not·be eligible for distribution until the next audit or up to one full year later. It seems reasonable to expect, and Article I, Section 4(b), seems to dictate, that the trustee would reinvest any such funds for the period of time between receipt of those funds and their distribution after the next annual audit. An obligation to reinvest therefore does not convert receipts to corpus.

Additionally, the obligation to reinvest appears to address a legal issue concerning passive trusts and the Statute of Uses that was significant in 1935 when the settlors drafted the Trust Agreement. Today, all trusts are generally assumed to be active. During the nineteenth and early twentieth centuries, however, courts sometimes concluded that a trust became passive when the trustee no longer had any active duties to perform, and that pursuant to the Statute of Uses, the passive trust "executed" and legal title to trust property vested in the beneficiary. *See Griggs v. Jefferson Bank & Trust Co.,* 57 S.W.2d 390, 391 (Tex.Civ.App., Texarkana 1933); *Brown v. Harris,* 7 Tex.Civ.App. 664, 27 S.W. 45 (1894); Tex.Trust Code § 112.032; 1 A. Scott & W. Fratcher, *The Law of Trusts* § 69.2 (4th ed.1987). Herein, the requirement in Article I, Section 4(b), of the Trust Agreement that the trustee "[hold] and re-invest" the proceeds from a sale of Trust property imposes active duties on the trustee which would avoid the operation of the Statute of Uses and thus would defeat any argument that the Trust should execute. *See Gentemann v. Dyer,* 140 S.W.2d 75, 78 (Mo.Ct.App.1940) ("selling" real property and "reinvesting the proceeds" are active duties that avoid the operation of the Statute of Uses).

rather than purchasing an interest in a partnership which in turn acquired the securities, then the securities would constitute corpus, and apparently so too would any profits that resulted from the sale of those securities. Defendant argues that given this result, this court's interpretation of net profits and net earnings as encompassing the capital gains in issue would unreasonably give the trustee the power to convert undistributable corpus into distributable net profits simply by interposing a partnership between the trustee and the underlying securities. Rather than this result being unreasonable, however, it would appear that the settlors of the Trust intended to grant the trustee such power.

First, as described above, the court's interpretation flows directly from the ordinary meaning of the words chosen by the settlors in drafting the Trust Agreement. Unless the Trust Agreement demonstrates a contrary intent, the best way to give effect to the settlors' intent is to interpret the settlors' words consistent with their ordinary meaning. *Fox v. Thoreson*, 398 S.W.2d at 92.

Second, at the time the settlors created the Trust, the common law permitted a trustee to choose among various business structures to direct receipts from an investment either to income beneficiaries or to remaindermen. For example, if the trustee invested corpus directly in securities, any increase in the market value of the securities would also constitute corpus. On the other hand, if the trustee invested in securities indirectly by purchasing shares of a corporation that purchased the securities, distributions of profits from the corporation in the form of cash dividends ordinarily would be classifiable as income rather than corpus. *Restatement of Trusts* § 236 (1935); *see also,* Tex.Trust Code §§ 113.102(a)(3) and 113.104(a)(1). Given this result, it is not apparent why, assuming the trustee chose to invest a portion of the Trust assets in a business such as ZH so as to produce distributable income, the settlors would have restricted the trustee to the use of a corporate structure, which

would result in double taxation, rather than authorizing the use of a limited partnership structure, which would allow for single taxation. In addition, in 1935, case law supported a trustee using a limited partnership structure in order to have receipts from an investment, in the form of capital gains, classifiable as income distributable to income beneficiaries. *Appeal of Merchants' Fund Ass'n,* 136 Pa. 43, 20 A. 527, 528–29 (Pa. 1890), involved facts similar to those involved in the instant case. In *Merchants,* a trust owned a limited partnership interest in a business that bought and sold land. The issue presented therein was whether capital gains earned by the partnership and credited to the trust could be distributed to the income beneficiary. The court concluded that they could. Thus, in 1935, the settlors of the Trust should have recognized that by choosing different business structures, the trustee, in effect, could vary the allocation of receipts from an investment between distributable income and corpus. Given this state of the law, had the settlors intended to preclude the trustee from investing in a business that would result in capital gains being treated as distributable income, the settlors reasonably would be expected to have demonstrated such an intent in the wording of the Trust Agreement.

Third, and related to the second point, perhaps the most convincing evidence in the Trust Agreement that the settlors did not intend to force the trustee to treat as corpus all profits classified as capital gains is the very broad degree of discretion the settlors allowed the trustee and advisory board. In theory, a trustee can direct individual investments of trust assets either toward growing corpus, income, or some combination of the two. Article I, Section 4(c), of the Trust Agreement essentially permits the trustee, with the advisory board's approval, to invest Trust assets in any way the trustee and advisory board deem appropriate so long as the investments are in the interest of the Trust Estate.[14] Thus, the Trust Agreement

14. After listing a lengthy series of possible investments, Article I, Section 4(c), contains the following broad authorization:

> [I]n general [the] Trustee, [with the] consent of the Advisory Board ... shall have full power in all matters not hereinabove specified to deal with and use the Trust properties and moneys

does not require the trustee to invest a specified minimum portion of Trust assets in investments that would tend to grow corpus or alternatively in investments that would tend to grow net profits. In addition, even when investments produce distributable net profits, the trustee has the discretion as to whether to distribute those profits. Given this very broad discretion granted to the trustee and advisory board with respect to investing and distributing trust assets, it would seem incongruous for the settlors to have restricted the trustee and advisory board from taking advantage of the benefits of a limited partnership arrangement for Trust investments directed at producing net profits. In other words, given the broad discretion granted the trustee and advisory board, if the trustee and advisory board decided to invest $5 million so as to produce net profits for possible distribution to Caroline Hunt, and also determined that the most efficient way to maximize these net profits was to invest in a limited partnership such as ZH, then it is not apparent why the settlors would have precluded such an option.

## VIII.

Defendant contends that the settlors' primary intent was to accumulate property, particularly capital gains, for the eventual benefit of the remaindermen and that allowing distribution of capital gains to Caroline Hunt would frustrate this intent. The absence of a mandate in the Trust Agreement requiring the trustee and advisory board to invest a minimum proportion of the Trust assets in investments that would tend to grow corpus, however, belies any such intent. Indeed, on balance, the wording of the Trust Agreement and the surrounding facts support the conclusion that the settlors' primary concern was to accumulate net profits for possible distribution to Caroline Hunt rather than to accumulate corpus for the remaindermen. On the first page of the Trust Agreement, H.L. and Lyda Hunt state that they are the parents of Caroline Hunt and that "it is [their] desire and purpose ... to create an irrevocable trust, known as the Caroline Hunt Trust Estate, for the use and benefit of Caroline Hunt." Caroline Hunt was 12 years old when her parents created the Trust and her parents could not have possibly known at that time who would succeed Caroline Hunt. The Trust Agreement does not mention successors to Caroline Hunt until Article III, Section 3, positioned on the second to last page of the 10–page Trust Agreement, which states:

> At the time of the death of the Beneficiary, her equitable interest in said Trust Estate, unless disposed of otherwise by said Beneficiary, shall pass to and vest in her heirs in accordance with the laws of descent and distribution then in force, applicable to the equitable interest of such Beneficiary in said Trust Estate. (The term "Beneficiary" applies not only to Caroline Hunt but to all her successors to beneficial interests under this trust.)

The court appreciates that a prohibition on the distribution of corpus tends to ensure that assets will remain in the Trust upon Caroline Hunt's death. In light of Caroline Hunt's youth at the time the settlors created the Trust, however, this prohibition seems at least as likely to promote Caroline Hunt's interests. A prohibition on the distribution of corpus would help to ensure that the corpus of the Trust Estate would be preserved over many years so that Caroline Hunt could receive profits earned on remaining corpus throughout her lifetime, *i.e.*, that distributions would not completely dissipate the Trust Estate prior to Caroline Hunt's death.[15]

---

and the income, proceeds, profits and revenues arising therefrom, and to manage and conduct the Trust hereby created in any manner that the said Trustee and said Advisory Board should see fit, and to execute and make all such agreements, deeds, mortgages, releases, lease contracts and instruments of all kinds, and to do such other things as may be proper for any of said purposes above named, and to do anything else properly incident thereto that to the said Trustee and said Advisory Board

may seem reasonable and to the best interest of said Trust Estate....

15. Article IV, Section 4, of the Trust Agreement also limits the distribution of assets to the beneficiary. It provides that "the Trustee shall never in any event pay to the Beneficiary, during any one calendar year, any sum in excess of Net Profits for the preceding calendar year." This provision likewise potentially benefits Caroline Hunt in that it tends to maintain in the Trust,

## IX.

The grant of summary judgment is appropriate when there is an absence of a genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56. In the instant case, there is no dispute as to any material issue of fact. For the reasons set forth above, the court concludes that the Trust's auditor correctly classified the ZH capital gains credited to the Trust as net profits potentially distributable to Caroline Hunt. Because these gains constitute net profits, for the reasons explained above, the trustee properly allocated the profits to income and included the profits in the calculation of the Trust's DNI. Thus, plaintiff is entitled to summary judgment.

Even if the court had concluded that the Trust Agreement was ambiguous with respect to the allocation of the ZH profits between corpus and income, plaintiff still would be entitled to summary judgment on an alternative ground. If the terms of a trust instrument do not direct the allocation of a receipt to either income or principal, Subchapter D of the Texas Trust Code controls. Thereunder, if the provisions of the Texas Trust Code defining income and principal, Tex.Trust Code § 113.102, fail to provide direction, then the trustee must make the allocation "in accordance with what is reasonable and equitable in view of the interests of those entitled to income and to principal." Tex.Trust Code § 113.101(a).[16]

In the instant case, the Texas Trust Code definitions of income and principal do not direct the allocation of the ZH capital gains either to income or to corpus. The Texas Trust Code defines income as "the return derived from the use of principal including ...," and then provides eight examples. Tex.Trust Code § 113.102(a). None of the examples addresses profits credited to a trust from a limited partnership. The Texas Trust Code lacks a similar generic definition of principal and relies exclusively upon ten examples ("Principal includes ..."). Tex. Trust Code § 113.102(b). Again, none of the examples addresses profits of a limited partnership credited to a trust.[17] Example eight of Section 113.102(b) broadly defines principal as "profit resulting from any change in the form of principal." As explained generally above, however, the ZH profits credited to the Trust did not result from any change in the form of principal. The Trust's limited partnership interest in ZH was part of the principal of the Trust but the Trust's interest in ZH did not change in form during the tax periods in issue.[18] The securities purchased

---

under the control of the trustee, net profits that are available for distribution to Caroline Hunt at a future time.

**16.** Tex.Trust Code § 113.101(a) directs a trustee to allocate between principal and income as follows:

[B]y crediting a receipt or charging an expenditure to income or principal or partly to each:
(1) in accordance with the terms of the trust instrument;
(2) in the absence of any contrary terms of the trust instrument, in accordance with this subtitle; or
(3) if neither of the preceding rules of administration is applicable, in accordance with what is reasonable and equitable in view of the interests of those entitled to income and to principal.

**17.** Both parties argue by analogy that the instant circumstances are similar to allocations directly addressed by the Texas Trust Code. For example, plaintiff, relying on Section 113.102(a)(3), argues that a limited partnership is like a corporation and therefore capital gains from ZH should be considered income because receipts from the ZH partnership are like receipts from a corporation. But ZH is a limited partnership, not a corporation, and therefore Section 113.102(a)(3) does not apply. Plaintiff also relies upon Sections 113.102(a)(5) and 113.106 which provide that net profits from an ongoing business that was started by the settlor of a trust shall be treated as income. Here, the settlors did not start ZH, and thus, Sections 113.102(a)(5) and 113.106 do not apply. Defendant, relying on Section 113.104(c)(3), argues that ZH is like a regulated investment company and therefore ZH capital gains are principal because Texas law allocates the capital gains from a regulated investment company to principal. ZH, however, does not qualify as a regulated investment company because as stated in note 12 above, the definition of a regulated investment company requires in excess of 100 shareholders. 15 U.S.C. § 80a–3(c)(1).

**18.** Plaintiff appended to its reply to defendant's supplemental brief an affidavit from E. James Gamble, who was appointed Co–Reporter by the National Conference of Commissioners on Uniform State Laws for the revision of the Uniform Principal and Income Act. In his affidavit, Gam-

and sold by ZH were not Trust investments and thus cannot be classified as principal of the Trust Estate.

Assuming that the Trust Agreement and the Texas Trust Code definitions of income and principal do not dictate the allocation of ZH capital gains to either corpus or income, the court must then determine whether the trustee's allocation of ZH profits to income was "reasonable and equitable in view of the interests of those entitled to income and to principal." Tex.Trust Code § 113.101(a)(3). Upon review, the court concludes that the trustee's allocation satisfies this standard.

First, the process by which the trustee made the allocation to income supports the trustee's action. The Trust Agreement provides that net profits are to "be determined by the annual audits as provided for [in the Trust Agreement]." Consistent with this mandate, the trustee hired a nationally known certified public accounting firm which, based on its expertise, concluded that "in accordance with the Trust Instrument and the Texas Trust Code," the ZH profits should be allocated to earnings available for distribution. Hence, in allocating the ZH profits, the trustee merely relied upon the advice of an expert. Such reliance would seem both equitable and reasonable.

Second, the small proportion of Trust assets invested in ZH and the broad discretion allowed the trustee and advisory board in making trust investments also support the trustee's action. The $5 million investment in ZH constituted less than one percent of the value of the Trust at that time. The trustee's determination to allocate to income capital gains resulting from an investment of less than one percent of the Trust assets would not seem to pose any substantial risk to the interests of the remaindermen. Moreover, given the broad discretion allowed the trustee and advisory board in allocating investments, the determination to invest a minor proportion of the assets of the Trust Estate toward producing distributable net profits would be well within that discretion. Indeed, to the extent that the allocation to income of the ZH profits potentially tipped the balance too far in favor of Caroline Hunt's interests as opposed to the interests of the remaindermen, the trustee could either determine not to distribute all the income to Caroline Hunt or, with the advisory board's approval, shift other Trust assets toward increasing the growth of corpus. In this factual setting, the trustee's allocation does not unreasonably or inequitably affect the interests of the remaindermen.

### X.

One last point warrants mention. This suit does not raise an issue of whether profits resulting from a purchase of securities are subject to federal income taxation. The profits in issue here are indisputably subject to taxation. The only issue is to which entity the ZH profits constitute income and hence, which entity is responsible for paying tax on those profits. As described above, Congress envisioned trusts being used as conduits through which income can flow to its beneficiaries and anticipated that either the trust or the income beneficiaries, but not both, would pay tax on trust income in the year the income was earned. Congress left it up to the settlors of a trust when drafting the trust instrument to determine whether the trust or the income beneficiaries would bear the tax burden on income earned by the trust. Hence, the central question in the instant case is not whether tax will be paid on the ZH capital gains credited to the Trust, but rather whether the settlors, in effect, determined that the Trust or the beneficiary should pay that tax. For the reasons set forth above, the court finds the trustee's conclusion to be correct that the settlors determined that the beneficiary should bear the tax burden for the ZH capital gains at issue here.

ble states his opinion that the Uniform Principal and Income Act of 1962 and the provisions of the Texas Trust Code that derive from that Act do not contain a rule which governs the allocation of the ZH profits to either principal or income. Defendant responded by moving to strike Gam-

ble's affidavit. The court, however, has relied upon the plain meaning of the wording of the Trust Agreement and the Texas Trust Code and not the contents of the Gamble affidavit. Defendant's motion to strike is therefore denied as moot.

## Conclusion

For the reasons set forth above, plaintiff's motion for summary judgment is granted and defendant's cross-motion is denied. On or before October 6, 1995, the parties shall file a stipulation as to the amount due plaintiff pursuant to this decision.

IT IS SO ORDERED.